Minzesheimer v. Doolittle.

*For affirmance*—Lippincott—1.

---

Charles Minzesheimer et al., complainants and respondents,

*v.*

Elmer E. Doolittle and Ellen I. Doolittle, his wife, defendants and appellants.

[Filed March 5th, 1900.]

1. Contracts to pay differences on the rise and fall of the price of cotton in the New York Cotton Exchange, are wagering contracts, although they are made in the form of purchases and sales of cotton for future delivery.

2. A New Jersey court of equity will not aid judgment creditors to enforce a judgment for debts growing out of wagering contracts, although the contracts were made in another state, where they were legal, and although the defendants in the bill were non-residents of New Jersey and have not in their answer set up the character of the contracts as a defence.

---

On appeal from a decree advised by Vice-Chancellor Emery, whose opinion is reported in *11 Dick. Ch. Rep. 206.*

*Mr. Frank Bergen,* for the defendants, appellants.

*Mr. Mahlon Pilney,* for the complainants, respondents.

The opinion of the court was delivered by

Dixon, J.

On November 15th, 1887, Elmer E. Doolittle conveyed to his wife, by a deed to his brother and a second deed from the brother to Mrs. Doolittle, a tract of land in Montclair, New Jersey, where they then resided. At that time Doolittle was engaged in so-called purchases and sales of cotton on margin with Charles Minzesheimer & Company, brokers on the cotton exchange in New York City, the result of which was that on March 27th, 1888, when the transactions were closed, a balance appeared against Doolittle amounting to $3,295.21. Shortly afterwards Minzesheimer & Company sued Doolittle in the supreme court of New York for said balance, and recovered a judgment, on which they then brought suit against him in the supreme court of New Jersey, and on August 20th, 1888, obtained a judgment for $3,427.62. By *fieri facias* on that judgment, levy was made on the Montclair property, and then a bill was filed in the court of chancery by Minzesheimer & Company against Mr. and Mrs. Doolittle, to set aside the above-mentioned conveyance, as one contrived in fraud, with intent to hinder, delay or defraud creditors, and thus to secure the sale of the property in order to satisfy the complainants' judgment. On this bill the court of chancery decreed according to the prayer, and thereupon the defendants appealed.

Before entering upon an investigation as to the *bona fides* of the conveyance to Mrs. Doolittle, a preliminary question is presented respecting the standing of the complainants.

The testimony makes it clear that what are called purchases and sales of cotton on margin were not in fact purchases and sales at all, but were mere speculations on the rise and fall of the price of cotton on the New York Cotton Exchange. This is evident from the enormous disproportion between the cash furnished by

Doolittle to the complainants and the amount of the nominal sales and purchases made by them on his account, and from the fact that the transactions always provided for nominal deliveries several months in the future, while it was expected and intended that, before the time for delivery should arrive, each transaction should be covered, so far as it could be, by a counter transaction, that is, a purchase by a sale, and a sale by a purchase, and only the differences should be paid or adjusted by debits and credits. The transactions were precisely of that character which, in *Flagg* v. *Baldwin, 11 Stew. Eq. 219,* this court declared would mark them as wagers, so that they would, if occurring in New Jersey, be unlawful and void. In that case it was also decided that when the courts of this state are asked to enforce such transactions, or obligations founded upon such transactions, they will refuse, although the transactions took place in another state where they were not unlawful.

Plainly, that decision bars these complainants at the threshold of the case, unless it is obviated by matters now to be considered.

*First.* The complainants contend that the refusal of our courts to aid such transactions arises solely out of a purpose to protect our own citizens, and, as Mrs. Doolittle was a citizen of Connecticut when the present bill was filed, she cannot profit by it.

Whether such a purpose would accord with the letter and spirit of the federal constitution, which guarantees to the citizens of each state all privileges and immunities of citizens in the several states, need not be decided, for, when Mrs. Doolittle acquired the rights which are now assailed, and when the complainants' claim as creditors accrued, Mrs. Doolittle and her husband were citizens of New Jersey, and entitled to whatever protection the courts of their state could afford them. Mrs. Doolittle's estate was then indefeasible by any wagers which her husband had made or might make anywhere, and we know of no principle by which her removal to another state could render her title to land in New Jersey less secure against such attack.

But the complete answer to the complainants is that the court's refusal to act does not rest upon regard for the defendants. It is based on the unwillingness of the court to use the powers which were granted for the furtherance of lawful ends, in aiding

schemes the nature of which is condemned by the public policy of the state, a policy which holds a prominent place even in our constitution. *Hope* v. *Linden Park Association, 29 Vr. 627.*

*Secondly.* The complainants insist that, as the answer of the defendants does not set up or suggest any impropriety in the origin of the indebtedness from Doolittle to the complainants, such impropriety should not be noticed by the court.

While it is desirable that in every case such an obstacle to the complainant's success should be alleged in the pleadings, so that the complainant may not through lack of warning permit a partial disclosure of the truth to misrepresent his claim, and while the absence of such an allegation will induce the court to put on the testimony any reasonable construction that favors the complainant in this respect, yet when the court is sure that the real character of the transaction appears, and that it is one the enforcement of which would violate public policy, the court will not, for any delinquency of the defendant, lend its assistance to such violation.

*Thirdly.* It is urged that if the conveyance to Mrs. Doolittle was contrived in fraud to hinder, delay or defraud creditors and others, she is in no better position than her grantor; that he is precluded by the judgments of the law courts from showing the original character of the debts which are merged in the judgments, and therefore she is also estopped.

This reasoning likewise ignores the basis of the court's refusal to act.

But, even from the personal standpoint of the defendant, it is unsound.

The grantee in such a conveyance is not a trustee for the grantor, but holds a title perfectly good in law and equity against the latter. Only against those whom in fact or in legal contemplation it was intended to injure, is the title bad. The mere circumstance that after the conveyance a third person instituted suit and recovered judgment against the grantor cannot preclude the grantee from showing any condition of things which renders the pre-existing title valid against that judgment. The judgment, of course, fixes against all the world the *status* of the plaintiff as a judgment creditor of the defendant, but whether,

as a judgment creditor of the defendant, he is able to defeat a title which that defendant could not overthrow, is a question not decided by the judgment and not capable of being judicially settled until the owner of the title has had his day in court. This is the question which, viewing the suit merely as a controversy between the parties, Mrs. Doolittle had in this cause for the first time an opportunity to raise, and she was at liberty to contest the complainants' claim, notwithstanding the judgments against her husband in New York and New Jersey; she was at liberty to insist that the debts merged in those judgments, and therefore the judgments themselves do not deserve the aid of this court. Had she set up this defence by pleading, we should have been obliged to concede to her the right to establish it; for courts of equity do not always assist judgment creditors to enforce collection of their judgments. The complainant must come into a court of equity with a cause essentially equitable; it is not enough that his cause is unquestionably legal. *Rich* v. *Sydenham, 1 Ch. Cas. 202; Mississippi and Missouri Railroad Co.* v. *Cromwell, 91 U. S. 643; Randolph* v. *Quidnick Co., 135 U. S. 457; De Graw* v. *Mechan, 3 Dick. Ch. Rep. 219; Brinkerhoff* v. *Ransom, 12 Dick. Ch. Rep. 312.*

But, as said before, no failure on the part of the defendant to claim her personal rights, can blind the court to the intrinsic impropriety, for the court's sake, of the step which it is asked to take.

Our conclusion is that in the present instance these complainants are not entitled to the aid of a court of equity in New Jersey, and therefore the decree below should be reversed and the bill dismissed.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, VAN SYCKEL, DIXON, GARRISON, LIPPINCOTT, GUMMERE, LUDLOW, COLLINS, BOGERT, NIXON, HENDRICKSON, ADAMS, VREDENBURGH—14.

*For affirmance*—None.