## COFFE & CARKENER v. WILHITE.

No. 6218.   Opinion Filed February 15, 1916.

Rehearing Denied March 21, 1916.

(156 Pac. 169.)

1. **GAMING—Dealing in Futures—Sufficiency of Evidence.** Evidence examined, and **held** to establish clearly and unmistakably that the transactions involved in the contract upon which recovery is sought constituted "dealing in futures" such as are denounced by the statutes of this state.

2. **COURTS—Comity—Foreign Contracts—Enforcement.** This state is not obligated by any principle of comity to recognize and uphold as valid contracts made in another state which are violative of our penal statutes, or obnoxious to our express public policy; and, regardless of the validity of such contracts in the state where made, the courts of this jurisdiction will refuse to aid in their enforcement.

(Syllabus by Bleakmore, C.)

*Error from District Court, Washington County;*

R. H. Hudson, Judge.

Action by Coffe & Carkener, a partnership, composed of W. C. Coffe and another, against Ola Wilhite. Judgment for defendant, and plaintiffs bring error. Affirmed.

*B. B. Foster, W. H. H. Piatt,* and *Thomas R. Marks,* for plaintiffs in error.

*W. H. Kornegay,* for defendant in error.

Opinion by BLEAKMORE, C.   This action was commenced in the district court of Washington county on August 29, 1912, by the plaintiffs in error against the defendant in error to recover a balance alleged to be due upon an open account for advances made and services rendered by plaintiffs for defendant. The itemized account attached and made a part of the petition is as follows:

"Kansas City, Mo., Aug. 4, 1910.

"Ola Wilhite, Bartlesville, Okla. in Account with Coffe & Carkener, 101-02 Exchange Bldg., Kansas City, Mo.

"Debits.

| | |
|---|---|
| July 25, 1910, bought 30,000 bu. Dec. corn at .64¾ | $19,425.00 |
| July 25, 1910, bought 20,000 bu. Dec. corn at .60 | 12,000.00 |
| July 25, 1910, to commission | 37.50 |
| July 25, 1910, to commission | 25.00 |
| | $31,487.50 |

"Credits.

| | | |
|---|---|---|
| June 24, 1910, by sold 10,000 bu. Dec. Cgo. .58 | $5,800.00 | |
| June 24, 1910, by sold 10,000 bu. Dec. Cgo. .58⅛ | 5,812.50 | |
| June 25, 1910, by check | 500.00 | |
| June 27, 1910, by sold 10,000 bu. corn, (Dec. Corn) K. C. 53⅝ | 5,362.50 | |
| June 27, 1910, by check | 300.00 | |
| July 12, 1910, by sold 10,000 bu. Dec. cn. Cgo. .56¾ | 5,675.00 | |
| July 12, 1910, by sold 5,000 bu. Dec. cn. K. C. .51¾ | 2,587.50 | |
| July 12, 1910, by sold 5,000 bu. Dec. cn. K. C. .52 | 2,600.00 | |
| July 18, 1910, by draft | 500.00 | |
| July 20, 1910, by Ck. | 300.00 | |
| July 20, 1910, by draft | 450.00 | |
| | | $29,887.50 |

Balance due _____$ 1,600.00

"Interest at 6 per cent. from Aug. 4, 1910."

Defendant answered by way of denial, and alleged:

"The defendant says that, if at any time the plaintiffs did buy any corn and did render any services for the defendant, said buying of said corn and rendering of said

services was for the purpose of gambling on the Board of Trade of Kansas City, Mo., and that the plaintiffs intended to gamble on said board, and the defendant intended to gamble on said board, and that no records of said transactions were kept as required by the laws of the State of Missouri, and the plaintiffs in this case were running a bucket shop in Kansas City, Mo., at the time of the transactions referred to, and were engaged in the practice of buying and selling options, and in furtherance of their designs and in violation of the laws of the State of Missouri, in violation of the laws of the United States, and in violation of the laws of the State of Oklahoma, the transactions relied upon were had, and it was the purpose of the defendant and of the plaintiffs both to gamble on grain."

The answer was later amended by setting forth certain provisions of the statute of the State of Missouri, but the same were not introduced in evidence.

At the close of the evidence on behalf of plaintiffs, a demurrer thereto was sustained, and judgment rendered for defendant. This action of the court is assigned as error.

Plaintiffs were commission brokers and members of the Board of Trade of Kansas City, Mo., and Chicago, Ill. The defendant is a resident of this state. The transactions involved in the account sued on consisted entirely of the purchase and sale of corn on the Board of Trade at Kansas City and Chicago, made by the plaintiffs, upon instructions of defendant.

The testimony is voluminous, and we shall refer only to portions thereof showing the general character of the transactions which form the basis of this action. One of the plaintiffs testified:

"A. Well, Mr. Wilhite was short of this corn, and towards the latter part of the month of July, contrary to

his expectations, the corn market commenced to advance, and as it d'd so he remitted and we made drafts on him to supply the needed margin on this account, and he took care of them very promptly, and we assumed that he would continue to do so if necessary. We had nothing to the contrary to indicate that he would not. Now on— The corn market commenced to get very excited along about that time, and on, for instance, on July 20th, the closing price of December corn at Chicago was 59¾ cents to ⅞, and Kansas City 55⅝. These figures I am reading, you can verify by the price card there, and on the next day it closed at 59¾ to ⅞ in Chicago. That was up 1¼ cents or ¾ to ⅞ in Chicago, and in Kansas City it closed 57¼ to ⅜, which was up about 1½ cents, and that was the day on which we made draft on Mr. Wilhite for $1,200.

"On July 22d, the corn market broke. It went down as much as it went up the day before, and a little bit more —closed at 59⅜ to ¾ in Chicago, and 55⅜ in Kansas City. On July 23d, which was Saturday, it closed at 60¾, ¼ to ⅜ and 56⅜ to ½ in Kansas City. On that day I had a conversation with Mr. Wilhite over the 'phone, and he explained about this draft having gone to protest, and he gave me an order that in case Kansas City December corn went to 57⅛ we were to buy to this Kansas City December corn an equal amount to what he had sold, and in case Chicago December corn went to 61⅛ we were to buy in an equivalent amount to what he was short in that market which I believe was 30,000 bushels.

"Now the price of corn had not reached that figure as embodied in those orders on Saturday, July 23d. In the meanwhile this draft had been protested, and Saturday was a short day, the market closing at 12 o'clock, that left something like about a net credit of $437 in order to protect this open line of corn. So there wasn't anything we could do except to watch the market and, if necessary, buy corn in at that order price. Now, from Sunday, over Sunday the weather was extremely hot, and the market went into one of those convulsive conditions such as I

have rarely seen—unfortunate for everybody concerned in this, and the market opened up in Chicago on Monday morning from 62 to 65 cents, that was up all the way from $1\frac{3}{4}$ cents to $4\frac{3}{4}$ a bushel. In Kansas City it opened from $59\frac{3}{4}$ to 60 cents. That was up 3 to $4\frac{5}{8}$ cents a bushel. There was nothing for us to do but execute these orders at the best possible price we could get, and we did so with the result of this account for which we are bringing this action.   *   *   *   Q. Did you know Mr. Wilhite had any corn? A. I didn't know anything about Mr. Wilhite. I assumed maybe he had. He was represented to me as a gentleman who had more or less property; I didn't know. Q. Did you make any inquiry, to ascertain whether he had any corn? A. No, sir; I did not.   *   *   *   Q. Now, what are you to do for that $\frac{1}{8}$ cent? I believe you are charging say $60. What do you do for Wilhite for that $\frac{1}{8}$ cent? A. I was to go in on the floor and make this sale for his account, and I was to buy it in whenever he ordered me to buy it in, and if I did so that would complete the transaction, and for which we would charge him $\frac{1}{8}$ cent per bushel. Q. When he puts up this margin, what are his rights about closing the transaction on any market day? A. He has the privilege to do that whenever he elects. Q. To do so? A. Yes, to order me to do so. Q. Yes. And if he elects so to do, how do you close it for him? A. By making a purchase in the same way; in the same manner that I made the sale. Q. By another? A. Buying a similar contract, contract to buy similar grain. Q. And to keep sufficient margin to buy that makes these—and to keep up sufficient margins to buy, it is that he makes these deposits, is it, and puts up your commission for so doing? A. Yes, sir. Q. Well, after you have bought on the market an offset to this stuff that Mr. Wilhite is supposed to have sold to you, then the matter is closed, as I understand it? A. Yes. Q. And if there is a profit to Mr. Wilhite, you send it to him? A. Yes, sir.   *   *   *   Q. If you had closed out on the 23d, he would have lost merely what he put up. A. Not quite what he put up; it would have been closed on the basis

of the closing market that night. Then he would have lost what he put up less $437.50. Q. How much margin in all did you get Wilhite to put up? A. $2,050. Q. And you are now suing for $1,600 more? A. Yes."

Plaintiff also stated that the Board of Trade maintained a clearing house similar to that employed by banks, and, as illustrative of its operation, testified:

"A. I may have 100,000 bushels of December corn bought for A., B., C., and D. and I might have 150,000 sold for E., F., G., and H. Therefore my net result would be that I owe the clearing house 50,000 corn, or the difference between the closing price and the price at which these trades were made. Q. So that at night you know just where you stand on every one of these trades, and it is adjusted so that you can clean up on the market every day. A. Yes, it is brought up to the closing market each night, but when final delivery day comes, and all these trades that have not been eliminated or bought in or sold out, as the case may be, the net result is what I have got to reckon with, unless— Q. Is it not a fact— A. Let me finish my question. And I have got to deliver or fulfill these contracts to the clearing house if they are sold, or I must stand up and take what they will deliver to me, and, if I don't do it, in either case there are penalties provided under our rules. Q. Now, let me see if I understand it. Every night, you have a credit side, and you have a debit side, and when you are through with that you owe the clearing house, or the clearing house owes you, is that right? A. Yes, sir. Q. The next night you run in that general balance, do you? A. Yes. Q. And that continues right straight along there all the time? A. Yes, sir. Q. And you have balances back and forth? A. Yes. Q. What becomes of the contracts that are balanced? A. Well, that—it comes out in the net result, as I told you, the excess over or above, or net— Q. That excess is figured every day? A. Yes. Q. The transactions are closed every day? A. Well, yes. Q. And

what about the fluctuations the next day on that stuff? Who assumes that? A. Well, it all depends on the net result of our sheet or the other fellow's sheet, or—each firm has a sheet, there must be just as much long as there is short, somewhere; and these are for convenience sake adjusted that way every night."

On June 24, 1910, the following letter was written by plaintiffs to defendant:

"Mr. O. Wilhite, Bartlesville, Okla.—Dear Sir: We inclose memo. of sale of 20 Chicago December corn on your instructions today. Opening prices were about the lowest. The wheat market turned very strong and corn advanced sharply in sympathy with wheat, finally reaching 59½c but closing easier at 58⅝c. We are in receipt of a wire from the First National Bank of Parsons, advising remittance of $500.00 for your credit. We had occasion to talk to Mr. Benedict later and therefore at his suggestion we will address our communication direct to you at Bartlesville. If it is your wish to carry this transaction and place further margin should it be necessary, we will be glad to have an expression of your wishes in the matter so that we can act in accord with the same.

"Yours truly,

"COFFE & CARKENER."

The memoranda of the transactions, furnished by plaintiffs to defendant, contained the following:

"On all marginal business the right is reserved to close transactions when margins are running out without giving further notice. All trades through us for your account are subject to the rules and regulations of the Kansas City Board of Trade or amendments thereto."

By the statutes of this state (Rev. Laws 1910) it is provided:

"Sec. 972. Those contracts are unlawful which are: First. Contrary to an express provision of law. Second.

Contrary to the policy of express law, though not expressly prohibited. Or, third. Otherwise contrary to good morals."

"Sec. 2486. By each of the expressions 'futures,' 'dealing in futures,' and 'future contracts,' as these terms are used in this article, is meant: First. Sale or purchase, or contract to sell, or any offer to sell or purchase any cotton, grain, meat, lard, or any stocks or bonds of any corporation, to be delivered in the future when it was not the *bona fide* intention of the party being prosecuted under this article, at the time that such sale, contract, purchase or offer to sell or purchase was made, that the thing mentioned in such transaction should be delivered and paid for as specified in such transaction. Second. Any such sale, purchase, offer or contract where it was the intention of the party being prosecuted hereunder at the time of making such contract or offer, that the same should, or, at the option of either party, might be settled by paying or receiving a margin or profit on such contract."

"Sec. 2489. If any person shall act or offer to act as the agent or broker of any person in making or offering to make any future contract contrary to the second section of this article, he shall be fined not less than one hundred nor more than two thousand dollars, and shall be confined in the county jail not less than one nor more than six months."

Considering the evidence as a whole, it clearly and unmistakably appears that the contracts involved mere dealings in the differences between prices of the corn ostensibly bought and sold as the same were fixed by the fluctuating daily market afforded by the Board of Trade at Kansas City and Chicago; and that the gains or losses of defendant might be and in some instances were in fact settled by receiving or paying a margin or profit on such contracts. Such transactions are unlawful and against

the public policy of this state, as evidenced by the provisions of the statutes above quoted.

The established doctrine is that courts of one state or country having jurisdiction of the parties will, generally, as a matter of comity, enforce contracts made and performable in another. This rule, however, is subject to the very comprehensive exception that such contracts, though permissible by the laws of other states, are not enforceable in our courts if they contravene our laws, our standard of morality, or public policy. This state is not obligated by any principle of comity to recognize and uphold as valid contracts made in another state which are violative of our penal laws. The transactions constituting the contracts upon which recovery is sought herein clearly contravene our statutory enactments; they are obnoxious to our express public policy; and therefore, regardless of their validity in the state where made, the courts of this jurisdiction will refuse to aid in their enforcement.

In *Flagg v. Baldwin*, 38 N. J. Eq. 219, 48 Am. Rep. 308, it is said:

"The enforcement of a foreign law and contracts dependent thereon·for validity, within another jurisdiction and by the courts of another nation, is not to be demanded as a matter of strict right. It is permitted, if at all, only from the comity which exists between states and nations. Every independent community must judge for itself how far this comity ought to extend. Certain principles are well-nigh universally recognized as governing this subject. It is everywhere admitted that a contract respecting matter *malum in se*, or a contract *contra bonos mores*, will not be enforced elsewhere, however enforceable by the *lex loci contractus*. An almost complete agreement exists upon the proposition that a contract valid where made

will not be enforced by the courts of another country, if in doing so they must violate the plain public policy of the country whose jurisdiction is involved to enforce it, or if its enforcement would be injurious to the interest or conflict with the operation of the public laws of that country" (and cases cited).

In *Gooch v. Faucett*, 122 N. C. 270, 29 S. E. 362, 39 L. R. A. 835, it is held:

"A contract of another state valid where it was made will not be enforced in a state in which it is forbidden by public policy."

In *Pope v. Hanke*, 155 Ill. 617, 40 N. E. 839, 28 L. R. A. 568, it is said:

"While it is true, however, that one state or nation will recognize and execute the laws of another through comity, yet the principle of comity does not permit the enforcement of foreign laws, which are prejudicial to the interests of the state where they are sought to be enforced. A contract made in one state will not be enforced in another, when to do so would contravene the criminal laws of the latter state, or would be against the express prohibition of its laws. Comity between different states does not require a law of one state to be executed in another when it would be against the public policy of the latter state. No state is bound to recognize or enforce contracts which are injurious to the welfare of its people, or which are in violation of its own laws. *Mumford v. Canty, supra* [50 Ill. 370, 99 Am. Dec. 525]; Story, Confl. sec. 327; *Faulkner v. Hyman*, 142 Mass. 53 (6 N. E. 846); *Hill v. Spear*, 50 N. H. 253, 9 Am. Rep. 205; *Fisher v. Lord*, 63 N. H. 514 (3 Atl. 927)."

In *Gist v. Western Union Telegraph Co.*, 45 S. C. 344, 23 S. E. 143, 55 Am. St. Rep. 763, it is held:

"Where an action is brought to enforce a demand arising out of a contract for 'cotton futures' in a state

where such contracts are illegal, the fact that such contracts are legal where the contract was made will not support the action."

In *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703, 83 Am. St. Rep. 928, it is held:

"A state court will not hold a contract, made under the laws of another state, valid, where such contract violates the law or is opposed to the public policy of the state of the forum."

In *Winward v. Lincoln,* 23 R. I. 476, 51 Atl. 106, 64 L. R. A. 160, it is held:

"A note, valid where made, cannot be enforced in another state to whose public policy the transactions which form its consideration are contrary."

See, also *Minzesheimer v. Doolittle,* 60 N. J. Eq. 394, 45 Atl. 611; *Benton v. Singleton,* 114 Ga. 548, 40 S. E. 811; Wharton on the Conflict of Laws (3d Ed.) sec. 428; 9 Cyc. 674.

It follows that the judgment of the trial court should be affirmed.

By the Court: It is so ordered.