Ed DePenning et al., appellants, v. F. L. Bedell, executor of estate of Peter DePenning, et al., appellees.

No. 47727.

(Reported in 44 N.W.2d 385)

OCTOBER 17, 1950.

REHEARING DENIED JANUARY 12, 1951.

Campbell & Campbell, Brierly & McCall, and Hammer & Matthias, all of Newton, for appellants.

P. J. Siegers, of Newton, for appellee Bedell, as executor; Bray, Carson & McCoy, of Oskaloosa, for appellees Harry, Fred and Arie DePenning.

SMITH, J.—This $9000 real estate mortgage was executed by Peter DePenning and wife October 21, 1932. It purported to secure three $3000 notes, due October 21, 1942, payable respectively to Lain DePenning (deceased in 1938) and plaintiffs Ed DePenning and Nellie Waring, children of mortgagors. Plaintiff Rosa DePenning is the widow, and plaintiffs Leona Lanphier and La Verna Blackwood, the children, of Lain DePenning.

Peter DePenning died in 1948, his wife in 1933. The defendants here are the executor of Peter DePenning's will and Peter's sons, Harry, Fred and Arie, beneficiaries under his will. A seventh child, Maggie Cooper, is not a party.

The facts are difficult to state, not so much because in dispute as because the admissibility of the evidence concerning them

and the relevancy of the facts themselves are so vigorously questioned. Nevertheless it seems to be assumed by both sides that the mortgage and notes in suit here did not constitute an original transaction.

In 1920 Peter DePenning sold a 220-acre farm (not the premises involved here) to one Van Wyngarden, taking back a $45,976 mortgage. In 1922 he assigned interests therein to some of his children as follows: To Ed DePenning, Nellie Waring, and Maggie Cooper, $10,000 each, to Lain DePenning, $7000, and to Arie, $1000. He retained to himself an interest of $7976. It may be fairly assumed that former advancements to children had been made and the amounts in this assignment were fixed in order to equalize and consummate advancements so all seven children would receive $10,000 each. Certainly that seems a reasonable explanation of the transaction and there is no other offered.

But unfortunately "the best laid schemes o'mice and men gang aft agley." Economic forces were at work, unknown to Peter DePenning, as doubtless to most of us. In 1927 the mortgagor, Van Wyngarden, was unable to make his payments. A written refinancing contract was entered into by mortgagor, mortgagee and the assignee of the mortgage interests. By it the amount of the $45,976 debt was reduced to $30,000, the original mortgage released and debtor permitted to place a new $16,000 first mortgage elsewhere, from the proceeds of which (plus some other funds raised by the mortgagor in some other way) Lain received $2670 and Maggie, Nellie and Ed $5820 each. The father received nothing for his retained $7976 interest in the $45,976 mortgage that was released.

In addition to the cash payments Van Wyngarden executed a $12,000 second mortgage to Lain, Maggie, Nellie and Ed. The father was not named a mortgagee but Maggie's interest was subsequently (March 9, 1928) assigned to him. The record does not explain this last transfer. There is no evidence it had any relation to the refinancing.

In 1931 the mortgaged premises were conveyed (subject to the first mortgage of $16,000) to the four holders of this second mortgage and it was by them released of record. The four grantees held title until 1936 when the land was deeded back

to Van Wyngarden and by him conveyed to the holder of the first mortgage. The holders of the second mortgage realized nothing from it except they held title and right of possession subject to the first mortgage for approximately five years.

I. It was during this period (1932) the notes and mortgage in suit here were executed. The defendants assert they were without consideration and at most evidence only an intention or promise to make a gift to the mortgagees to recompense them for the shrinkage in value of the advancements originally made them in 1922, due to the depreciation in value of the original Van Wyngarden mortgage.

Plaintiffs rely in part on the statutory provision that "all contracts in writing * * * import a consideration." Section 537.2, I.C.A. Defendants contend that because plaintiffs pleaded and attempted to prove a specific consideration the statutory provision does not apply, citing Persia Savings Bank v. Wilson, 214 Iowa 993, 243 N.W. 581, Lane v. Richards, 119 Iowa 24, 91 N.W. 786, and Beh v. Van Ness, 190 Iowa 151, 180 N.W. 292. We doubt the applicability of this doctrine here so far as the pleading is concerned.

Plaintiffs did not plead a specific consideration in their petition but in reply to the executor's separate answer after all defendants had pleaded want of consideration they did allege: "That they * * * reaffirm the fact that said notes and mortgage were supported by a good and valuable consideration and that * * * [mortgagors] *were indebted to the plaintiffs in the amounts alleged therein.*"

We have italicized the language defendants claim constituted allegation of prior indebtedness as consideration. The use of the past tense "were" lends some support to this construction but it is also used in the first part of the sentence (*"were* supported by a good and valuable consideration * * *") where it undoubtedly had a present tense implication.

We fear the point is too doubtful to justify the application here of the principle contended for. We construe the language as a general reaffirmation of the fact that there was a consideration and that the mortgagor was *therefore* indebted on the in-

struments in suit. The reply of course was unnecessary. The averments in the answers were denied by operation of law. Gafford v. American Mortgage & Investment Co., 77 Iowa 736, 742, 42 N.W. 550; Iowa R.C.P. 73.

■ However, there is an interesting question raised by defendants as to the burden of proof on the issue of consideration. They contend in effect that pleading the written instrument made out only a prima facie case which cast on defendants the burden of going forward with the evidence; and that when defendants pleaded lack of consideration and offered proof to sustain it the burden of going forward shifted back to plaintiffs who at all times had the burden of proof.

In re Estate of Custer, 229 Iowa 1061, 1065, 295 N.W. 848, is cited. It involved however another Code section, 541.24,. I.C.A., found in the Negotiable Instruments chapter.

It must be conceded there is a similarity between the two statutes. Nevertheless we have heretofore quite definitely construed section 537.2 as casting on the one who pleads lack of consideration the burden of establishing his defense. Daries v. Hart, 214 Iowa 1312, 243 N.W. 527; North Side State Bank v. Schreiber, 219 Iowa 380, 387, 258 N.W. 690. Were the present case dependent on the burden of proof we might be confronted by the necessity of reviewing our former decisions. This however we need not do in view of our determination as to the weight of the evidence.

■ While plaintiffs did not plead a specific consideration, it must be admitted that in evidence they attempted to establish one. Code section 537.2 was sufficient to "import a consideration" and thereby to cast the burden of proof on defendants. But it could not "import" one different from the one relied on. Beh v. Van Ness, 190 Iowa 151, 154, 155, 180 N.W. 292. We therefore proceed to inquire whether the father executed these notes and mortgage in consideration of a prior oral agreement to do so.

■ ■ II. We are prepared to agree with plaintiffs that by the assignment in 1922 the assignees obtained vested interests in the original Van Wyngarden $45,976 mortgage. The assignment resulted in executed gifts. In 1927 they still owned those

interests and their father still retained his interest in the sum of $7976.

Plaintiffs, at the trial, did not rely entirely on the statutory presumption. They claim they were induced to consent to the refinancing by their father's oral promise to secure them from any resulting loss and that such promise constituted the consideration for the notes and mortgage in suit here. They claim he so promised because he was in need of actual cash. But the refinancing agreement itself shows he received nothing.

Furthermore, it is apparent the assignees had already suffered loss, if it be assumed the original mortgage was worth its face when the interests were assigned to them in 1922. This loss, if it was a loss, the father absorbed. On the other hand, if it be assumed the full value of their interests were still in the land in 1927, they were protected in the refinancing to the amount of over $20,000 in cash received and the $12,000 second mortgage which ran to Lain, Ed, Maggie and Nellie. Eventually (in 1931) they secured title by deed without foreclosure, subject only to the first mortgage.

Later (in 1935) they found they could not, or the land could not, carry even the burden of the $16,000 mortgages and in 1936 they voluntarily (so far as the record shows) relinquished the farm to the holder of the first mortgage by conveying to Van Wyngarden, so he could, by turning it over to the holder of the first mortgage, relieve himself of personal liability.

When the instruments in suit were executed (1932) plaintiffs still had all the security they ever had. They and their father (as assignee of Maggie's share) had full title to the land, subject only to the first mortgage, the full proceeds of which they and Maggie had received.

III. This leads us to a consideration of the testimony by which the claimed consideration for the instruments in suit is sought to be proved. The testimony came from Nellie Waring and Rosa DePenning, Lain's widow. They testified to two conversations between the father, Lain and Ed in which they (the witnesses) took no part and in which it is claimed the father agreed to protect the children from loss if they would sign the refinancing contract. Objections were urged under the "dead man's statute."

Mrs. Waring testified she was in an adjacent room and heard her father tell Lain and Ed: " 'Now you better take it [the second mortgage] and I will see that you don't lose anything by it' * * * 'I will mortgage the rest of my farm' * * * he seemed to be wanting some cash * * * he had borrowed money."

Rosa's testimony concerned a conversation in the barnyard in which the father pleaded his own ill health and urged the boys to accept the second mortgage and added " 'I will make this good.' "

The alleged conversations were more than twenty years prior to the trial and too fragmentary and indefinite to have much if any probative value, though possibly technically admissible. Makinson v. Shumick, 196 Iowa 980, 193 N.W. 407; In re Estate of Rich, 199 Iowa 902, 916, 917, 200 N.W. 713.

The witnesses do not say what if anything the other parties said. There is no evidence this was the deciding factor which induced them to sign or that they relied on it to any degree. The record does not show what stage the negotiations had reached.

The witnesses were not disinterested. The possibility that they misunderstood or that over the intervening years they became mistaken as to the purport of the conversations is so great as to diminish, if not to totally eliminate, the value of the testimony. The trial judge, who heard the testimony and saw the witnesses, expressed frank disbelief that the alleged conversations took place. .

The testimony on the other side consists of alleged conversations and statements constituting admissions. The times were comparatively recent and the parties to the conversations all living. The guardian of Peter DePenning testified Ed told him (in response to an inquiry, "What is the story of this mortgage?") "that some of the other children had received more than they had, the holders of the mortgage, and they had gotten their father to give them the mortgage to sort of equalize the shares."

The witness further testified: "And then I asked him, I said, 'Did you or the other holders pay your father anything for this mortgage or give him anything for it?' He said, 'No'."

The executor of Peter DePenning's will testified as to conversations with Ed and Mrs. Waring in which they told him

these notes in suit were "to show they didn't get as much as the others had * * * to make up for that." These were conversations with officials (guardian and executors) who were entitled to the facts.

Defendant Harry DePenning testified about a conference at which he, Ed, Nellie, Rosa and one of the daughters of Lain and Rosa were present, shortly after the senior DePenning died. The substance of the conversation, in which Ed, Nellie and Rosa all took part, was that "these notes was to equal up the shares with what we had * * * they had $5400 * * * that was what they got out of another farm. * * * These notes was to make us equal shares was what they claimed." The witness makes it clear that plaintiffs were demanding the full amount of the notes and their share of the estate besides. Mrs. Harry DePenning as a witness substantially confirmed her husband's account of the conference. She also testified "they wanted Harry to sign a paper. He said he wouldn't sign any paper to break the will."

Defendant Fred DePenning testified his sister, Mrs. Waring, in a conversation shortly before their father died, referred to the instruments in suit "as blanket note or mortgage of some kind that wasn't any good." In response to a leading question he testified she said the notes were given "to make them equal with the others." Mrs. Fred DePenning also testified to this conversation.

Mrs. Waring, on rebuttal, denied this testimony of both Fred and his wife and said she told Fred "now the mortgage referred to in the will [the mortgage in suit], that is money we didn't get." She seems not to have denied the other conversations. We do not find in the record any denial by Ed or Rosa DePenning of the statements attributed to them relative to the mortgage and notes in suit.

This is a hasty summary of the evidence relating to the question of consideration for the instruments sued on herein. It is perhaps too hasty to give a satisfactory picture of the situation. However, we have studied the record with care to determine whether there was a valid consideration.

We have concluded the trial court was right in his appraisal of the evidence. There is of course no direct proof. We do not

know from any direct evidence what if any arguments induced this father to execute these notes and this mortgage. We cannot, however, on this record, hold he was obligated to do so by reason of what took place in 1927 and 1928 in the process of refinancing. We agree with the trial court that the evidence shows no moral or legal duty-resting on him growing out of that transaction. It seems quite improbable that he went the length of obligating himself to underwrite, in order to persuade his children to consent to, a plan designed only to salvage something for them. He relinquished his entire interest in the original mortgage without receiving anything in return. The refinancing was for the sole benefit of the mortgagor and the children. There is a suggestion in argument that he did receive something by reason of the conveyance to him in 1928 by Maggie Cooper of her interest in the $12,000 second mortgage. As we have said, there is no apparent connection between this transfer and the written refinancing agreement.

Nor did the sequel show the refinancing was to the detriment of plaintiffs. With the cash in hand and the second mortgage they had substantially all their original interests with their father's equity eliminated besides.

We think the consideration which led these parents to execute these notes and this mortgage was an understandable and laudable desire to shield from loss their children who had not received in cash the full amount of advancement the others had received. But this does not constitute a legal consideration. Under this record we must conclude the instruments in suit represent unexecuted gifts. They were without consideration and unenforceable.

However much the father intended to do for plaintiffs he had a right to change his mind. The language of his will shows he did just that: "I purposely omit making any provision herein for my sons, Lain DePenning and Ed DePenning or my daughter, Nellie Waring, because of their conduct in obtaining from me a certain instrument purporting to be a mortgage in the principal amount of $9000 * * * and because of their refusal to release such mortgage, and I wish hereby to express my disapproval of such conduct." While the will would doubtless be inadmissible to prove self-serving declarations it is competent

for the purpose we have suggested. It clearly shows his change of any intention indicated by the instruments in suit.

IV.   Plaintiffs argue these admissions or statements against interest were not binding on the daughters, or at least one of the daughters, not present or participating in the conversations, that they derived their interests by inheritance from their father, Lain DePenning, and were not represented by plaintiffs who did not participate.

Defendants, to meet this argument, point out the failure of all plaintiffs to appear and object to the executor's petition to sell the real estate covered by the mortgage in suit; failure of the daughter to object to their mother's act, as administratrix of their father's estate, in omitting from the inventory the $3000 note in suit here; failure of their father, Lain, to list this note for assessment or to return any moneys and credits for taxation after 1931, though in 1928 and 1929 he listed $4000 and in 1931, $2000.

The listing or not listing of moneys and credits for taxation is perhaps not too significant as such assets are not usually itemized on tax returns and may be offset by indebtedness. However, Lain's discontinuance of a return of moneys and credits does synchronize with the release of his $4000 interest in the $12,000 Van Wyngarden second mortgage and its merger in the title to the land.

The failure by the executrix to report the note and mortgage in suit as an asset of the estate and the failure to object to its omission are unexplained, as is also the failure of all the plaintiffs to object to the proceedings for sale of real estate in the father's estate.

There is also the over-all picture. A court of equity should be permitted to disbelieve the improbable, and to consider the reasonable implications of a series of family transactions such as we have here. If, as we think the whole record tends to show, these notes and this mortgage were without valuable consideration and represented only an intention to make a gift, the maker had a right to repudiate them. This, we repeat, he clearly did by his will: "In the event that my said sons Lain DePenning and Ed DePenning and my daughter, Nellie Waring, or any of

them * * * should ever attempt to collect any interest on said mortgage or any of the notes thereby secured, it is my desire that my executor should contest the validity of said mortgage and notes."

V. Other defenses are urged by defendants: laches, by reason of plaintiffs' failure to sue until after the mortgagor's death, long after the notes by their terms would have been due; and res judicata and lack of jurisdiction of the court of equity, by reason of the prior probate proceedings which resulted in an order to sell the mortgaged real estate.

We do not discuss these except to emphasize them as having some relation to the question of consideration and to the admissions of plaintiffs by their conduct.

Plaintiffs, under the acceleration provision of the mortgage, might have declared the notes due for nonpayment of interest any time after October 21, 1933, since no interest was ever paid. The notes came due by their terms October 21, 1942, and Mr. DePenning did not die until 1948. There was a guardian of his property from January 1942 until his death. The delay in bringing suit until after the death of the mortgagor and the order of sale in probate of the mortgaged premises had been made has a significant bearing when we come to weigh the equities of the parties, even without considering the facts as constituting technical laches or res judicata or as precluding equity jurisdiction.

Peter DePenning was an illiterate but not an unjust man. He signed his name by mark or thumbprint, but he tried to hold the scales even among his children. He was probably thwarted by the inflation and ensuing depression of the 1920's and 1930's, and perhaps, to a degree, by the conflicting selfish interests of his children. Perhaps he should have consummated his plan, represented by these instruments, to equalize, in a measure, among his children. That was a problem for his—but not our—consideration.

Nevertheless we think he had a right to change his mind and that he did so. The decision of the trial court conforms to his final decision and wish. It is affirmed.—Affirmed.

All JUSTICES concur.