C. L. SISSON, appellee, v. CHRIS JANSSEN, appellant.

No. 48202.

(Reported in 56 N.W.2d 30)

DECEMBER 16, 1952.

Sweet & Sager, of Waverly, and Beecher & Beecher, of Waterloo, for appellant.

C. M. Parker, of Cedar Falls, and Pike, Sias, Butler & Hoxie, of Waterloo, for appellee.

SMITH, J.—Prior to September 12, 1948, plaintiff, of Ewing, Nebraska, owned a string of eleven race horses. He was racing them at the Playfair Race Association grounds in Spokane, Washington. One of them, "Our Sponsor", had won a race and been disqualified by the judges when it was found (after a hearing) that the horse had been "blocked" or "needled", meaning, in race-track parlance, injected with "dope" to stimulate it artificially. The judges issued and caused to be posted an order that plaintiff be, as he testifies, "ruled off, suspended for the balance of the meet, until the 11th of October, I believe it was."

We have no copy of the order nor of the law or rules and regulations under which it was issued. Plaintiff quotes the officials: "The judges said I could take the horses home or to Phoenix or race them any time after the 11th. * * * Mr. Macombre and Mr. Saunders said, I don't recall which, that I could transfer the horses and put them into another man's name, if it is acceptable to the judges."

One witness for plaintiff ("a good friend of mine and a good smart man") a fellow race horse owner, with eight horses entered in the same meet, testified (based on conversations with association officials and his own general knowledge) that it merely meant if plaintiff "wanted to run his horses he would have to transfer them into somebody else's name and get permission from the stewards to do this." He adds, "I told him [plaintiff] the transfer would have to be made in the office in front of the stewards. * * * there would have to be a transfer made with the state racing association and we talked about the officials demanding to see the transfer of the money."

Plaintiff claims it was pursuant to this concept of racing ethics that he and defendant, a resident of Cedar Falls, Iowa, executed this instrument:

"CONTRACT between Mr. C. L. Sisson and Mr. C. Janssen. September 12, 1948.

"Mr. C. Janssen is buying the following eleven (11) horses from Mr. C. L. Sisson: [Then follow names, description and pedigrees.]

"Mr. Janssen agrees to pay to Mr. Sisson $8000 as the total price to be paid as follows: $4000 in cash, the balance out of one half of the total purse money won by these horses until such time as the balance is paid. If any horse is claimed Mr. Sisson will get the total amount and it will be deducted from the balance.

"This contract will hold good at any race track that Mr. Janssen enters these horses.

"Witnessed by Russell K. Sanders, Assistant Racing Secretary at Playfair, Spokane.

"/s/ C. L. Sisson    /s/ Chris Janssen    /s/ Russell K. Sanders."

Plaintiff in reply admits the instrument was signed as above set out but denies it "ever was a written contract" and alleges it was signed "for the sole and only purpose of permitting the said horses to be raced in the name of defendant and for no other purpose."

Defendant, on the other hand, insists the transaction was a bona fide sale, that he paid the $4000 down and that plaintiff has since received half of a $2000 purse. Defendant tenders and has paid into court the alleged remaining $3000 of purchase price and appeals from the trial court's decision in plaintiff's favor.

I. That the property was delivered to defendant and that he brought it to Iowa is of course a verity since this proceeding was originally a replevin action to regain possession.

The signing of the memorandum and the delivery of possession are about the only unquestioned facts related to the transaction—they and the admitted fact that Our Sponsor was "blocked" and plaintiff disqualified.

While perhaps immaterial here, there is interesting disagreement as to who did the blocking of "Our Sponsor", one witness for plaintiff claiming he practically saw defendant in the act: "Mr. Janssen was down by the horse's front legs. I saw him get off the ground and hand Mrs. Janssen a hypodermic needle. She put it in her billfold or pocketbook." On the other hand, a defense witness (defendant's young son who worked for plaintiff) testifies: "Mr. Sisson was in the stall with Our Sponsor and Jack Cornstalk. Jack told me to stand in front of the door to the stall to see if anybody was coming around. He got down on his hands and knees and put the needle into the horse's leg. The material injected was procaine in a glass vial."

The same total disagreement appears as to the negotiations leading to execution of the contract and the payment or non-payment of purchase price. Plaintiff and his witnesses have defendant soliciting plaintiff: "Why don't you put them in my name and run them?" And "That will be all right—I'm honest." While defendant testifies: "The first I knew Mr. Sisson had horses for sale he came to my trailer house and wanted to sell me some horses."

Defendant says: "I had about $6000 in cash with me at Spokane. That money came from the sale of some corn, three

cattle sales and the sale of 250 acres against which there was a $2200 mortgage." His wife corroborates this testimony. He also says they were on their way to Seattle to buy horses and had stopped off at Spokane to see their son.

Plaintiff, however, testifies he told defendant "You will have to have some dollars show up in there * * * in order to show that they was transferred" and "Janssen said that will be all right but he didn't have any money to show anything. I said if it takes money I will put it up, I will furnish it all."

Plaintiff testifies that defendant in August had written him in Lincoln asking for a job: "I called him on the telephone and offered him five dollars a day. He said he couldn't go to Lincoln but would go direct to Spokane * * * and go to work as soon as the horses got up there. * * * The horses and Mr. Janssen were at Spokane when my wife and I got there. * * * I was paying him five dollars a day and five dollars extra every time a horse won."

Defendant tells a quite different story: "Mr. Sisson called me on the telephone the latter part of August and asked me to work for him and I told him that I could not but I would send my boy." He testifies positively: "I have never worked for Mr. Sisson and I never received any wages from him at the Spokane track or at any other time."

II. Someone is "mistaken." Fortunately for our own peace of mind we need not determine which one. We express no opinion on the comparative weight of the conflicting testimony as to the real intention and purpose of the parties.

Plaintiff naïvely argues the case is "as perfect an example as could be desired of all the witnesses on one side falsifying their testimony, and all the witnesses on the other side telling the truth" and that the court's first duty is to decide "which story is true."

We cannot agree. Our first duty we think is to examine the nature of the demand and to determine its relation to the racing rules and regulations and the order of suspension that had been entered against plaintiff. After all, we are in equity and the contract is clear on its face.

Plaintiff's theory is perhaps best revealed by one of his own witnesses: "In connection with verbal agreements when

people are ruled off the track it is the custom and usage to do that sort of thing. Racing officials know about it but they don't say nothing about it." Plaintiff himself quotes one official as warning him "Pick out a good honorable man you can depend on"; and again: "Be sure and have a good honest man."

While the evidence does not clearly advise us as to the racing rules and regulations and the order of the officials suspending plaintiff from the use of the racing facilities we must conclude something more was intended than to impose on plaintiff a mere colorable or fictitious penalty—something more than a mere requirement that he allow the horses to be raced in the *name* of someone else while himself retaining actual and even beneficial ownership of them. Even the quotation of what the officials said need not be construed as plaintiff assumes. The transfer "into another man's name" might mean a good faith sale.

Plaintiff testifies: "I am sure the state has a hand in the regulation of the race tracks in the state of Washington. The state provides judges for the tracks." His star witness who professed to know the rules says the posted rules are "put out by the state. The state supervises all race tracks." But whether the rules and regulations involved were of statutory or of merely local association origin we cannot hold them so meaningless as is contended by plaintiff.

The conduct of the parties, under plaintiff's own showing, was suggestive of an attempt to circumvent rather than comply with rules. If a bona fide sale was not required the parties certainly went to unusual and unnecessary pains, under plaintiff's evidence, to make it *appear* bona fide. The written contract itself evidences a good faith, aboveboard transaction. Whoever drew it—probably Mr. Sanders, the assistant racing secretary, who also witnessed its execution—must at least have intended it to *appear* as a valid sale.

If it was "phony", whom were they trying to fool? And if a sale was not necessary to comply with the rules and to circumvent the disqualifying order, why draw a *sale* contract at all?

Again, consider the testimony of plaintiff and his "good friend" as to making a *show* of actual payment of consideration. We have already referred to it. Plaintiff testifies it was the sub-

ject of much thought and conversation: He says he told defendant that the steward said "You will have to have some dollars to show in there in order to show that they were transferred"; also "I told him [defendant] there would have to be a payment * * * for approximately $4000 and if they demand that I will wire your bank the $4000. I said when you go up to the judges up there, you will probably have to write a check for $4000."

Plaintiff again testifies that in another conversation he offered to write defendant a check to send back to defendant's bank. And on cross-examination he says: "We talked about financing and Chris was to give me a check in front of the commissioners but I expect they forgot to mention it when the transfer took place." He says in another place "Mr. Macombre [one of the judges] said, 'I want to see the check to know that it is good.'" (Emphasis supplied.)

Whatever authority enacted the rule against "blocking", and whoever prescribed the penalty for its infraction, we assume both rule and penalty were in the interest of fair play and honesty. The purpose must have been to ensure to the public contests of speed free from fraud and trickery. We are not disposed to interpret either the rule or the penalty otherwise. The testimony cited above, as plaintiff construes it, would show a clear intent and purpose to fool the public if not the racing officials.

Actions speak louder than words. The parties placed their own construction on what was required by the rules and judge's order penalizing plaintiff for its violation. The signed contract speaks clearly. Its provisions for completing payment unmistakably recognize defendant's resulting ownership and the contingency of future winnings and even that a horse might be "claimed." It contains no hint of any hidden intent or purpose. After its execution the parties proceeded under it to all outward appearance. Defendant at once applied for owner's and trainer's licenses and entered the horses in his name as owner. They thereafter won $2000 which was divided between plaintiff and defendant as the contract required. One copy of it had been left on file in the secretary's office. After the meet was over the horses were brought by defendants to Iowa where they still are. We cannot ignore the conduct of the parties.

III. Plaintiff, in support of the trial court's decision, urges lack of consideration, conditional delivery and a mutual intent and understanding that the written contract was not to become effective to transfer title.

It is difficult to discuss the question of consideration apart from plaintiff's contention as to the real purpose of the transaction which would of course contemplate no actual consideration. Assuming the written contract was what it purported to be and not a mere pretense, we of course could not rescind or cancel it in equity for mere failure or want of consideration. 12 C. J. S., Cancellation of Instruments, section 23; 9 Am. Jur., Cancellation of Instruments, section 24; Huggins v. Mathews, 199 Iowa 1025, 1027, 203 N.W. 242.

Under our statutes the written contract would import a consideration even if none were named. Section 537.2, Code, 1950. And plaintiff had the burden of showing there was none, were he relying on that as a separate defense. Code section 537.3; DePenning v. Bedell, 242 Iowa 102, 106, 44 N.W.2d 385. Our decisions are unwavering in so announcing.

We conclude the question of consideration here is immaterial. Plaintiff cites authority for the proposition that want or failure of consideration may be shown by parol evidence and that introduction of such testimony does not constitute an attempt to vary the terms of a written instrument by parol. We concede the correctness of the abstract proposition, but it is inapplicable here.

IV. The contentions that delivery was conditional and that there was no intention to make an actual sale are really identical. There is of course no doubt both contract and property were *actually* delivered. The real claim is that there was only a pretended sale and that the delivery was in furtherance of the pretense.

We have already indicated disapproval of the entire contention under the facts shown here. The maxim "he who comes into equity must come with clean hands" has been said to be based on grounds of public policy and protection of the integrity of the court, 30 C. J. S., Equity, section 93; on "conscience and good faith", 19 Am. Jur., Equity, section 470. It will, in a proper case, be invoked by the court though neither party pleads it. "Courts apply it, not to favor a defendant, but because of

the interest of the public." Bell & Howell Co. v. Bliss, 7 Cir., Ill., 262 F. 131, 135. See also Minzesheimer v. Doolittle, 60 N. J. Eq. 394, 45 A. 611. It is of course a doctrine which may be invoked only to prevent affirmative equitable relief. Spitler v. Perry Town Lot & Improvement Co., 189 Iowa 709, 711, 179 N.W. 69. It "expresses rather a principle of inaction than one of action. It means that equity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief." 30 C. J. S., Equity, section 93, page 476, note 88. See also 19 Am. Jur., Equity, section 473; Strahan v. Strahan, 205 Iowa 92, 217 N.W. 436.

In the instant case plaintiff, not defendant, is invoking equity. It is no help to plaintiff if, as his contention implies, the parties are *in pari delicto*. Assuming (without determining) that they are, equity leaves them where it finds them.

V. It is argued on behalf of plaintiff that the "clean hands" doctrine is inapplicable here for various reasons: e.g., that the claimed oral agreement was neither illegal nor malum in se because the defendant failed to show any express statute or racing association rule which forbade such a transaction as defendant claims this was. What we have said in Division II answers this contention without further elaboration. It is clear that a transaction of the sort claimed by plaintiff would be against public policy and immoral. Equity cannot be a party to it. We know of no case that holds the maxim merely condemns acts violative of statute and acts malum in se. We think it means "that equity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief", and that "the maxim is based on conscience and good faith." 30 C. J. S., Equity, section 93, page 477.

VI. Lastly it is argued that application of the "clean hands" doctrine here would unjustly enrich defendant at plaintiff's expense. A long discussion from a recent Wyoming case is quoted on the theme that an equitable principle would be violated if one party to a fraudulent transaction were permitted, under protection of the "clean hands" rule, to unjustly enrich himself at the expense of his confederate. Wantulok v. Wantulok,

67 Wyo. 45, 50, 51, 223 P.2d 1030, 1032, 1033, 21 A. L. R.2d 585. It refers to the "clean hands" and "unjust enrichment" rules as "clashing and irreconcilable" and concedes it is not always easy to determine which one should "predominate." The opinion was upon a rehearing petition, the original opinion being found in 67 Wyo. 22, 214 P.2d 477, 21 A. L. R.2d 572.

The Wyoming court goes no further than to conclude the "clean hands" rule "cannot be applied rigidly" and that plaintiff's sole part in the transaction, in that case, being "comparatively passive", the doctrine could not be invoked to prevent her recovery of what had been conveyed by her husband in alleged fraud of creditors.

Under the record here there is no such showing. Plaintiff's own evidence would brand him as being equally guilty with defendant in perpetrating the alleged fraud on the public and against public policy. So far as this record shows $8000 was a fair price for the property. If paid there could be no "unjust enrichment." If not paid plaintiff's remedy would be at law to compel its payment.

It may be conceded modern text writers and perhaps some courts have been inclined to minimize the doctrine of "clean hands" by balancing against it a rule discouraging unjust enrichment. The Wyoming court in the second Wantulok case cites cases (as examples of "comparatively recent innovation") in which innocent heirs or distributees of a fraudulent grantor were permitted to recover, notwithstanding the fraud of the ancestor: viz., Finnegan v. La Fontaine, 122 Conn. 561, 191 A. 337; Merz v. Tower Grove Bk. etc. Co., 344 Mo. 1150, 130 S.W.2d 611; Hurwitz v. Hurwitz, 78 App. D. C. 66, 136 F.2d 796, 148 A. L. R. 226, and annotations. The cited annotation however says "the overwhelming weight of authority" is against even this innovation. It cites Stephens v. Harrow, 26 Iowa 458, among many cases from other jurisdictions as holding to the contrary (majority) rule. Quite recently, in Shaw v. Addison, 239 Iowa 377, 395–398, 28 N.W.2d 816, 826, we invoked it in a case in which a daughter, as administratrix and sole heir of her father, sought to recover from a grantee property her father had conveyed "in order to avoid the lien of a deficiency judgment."

In that case (page 395) it was also contended some of the property was conveyed "to escape income tax." We said: "Plaintiff cannot secure a decree of reconveyance in a court of equity on such a theory", citing authorities; and again, "The transfer which has for its object and purpose the evasion of taxation is analogous to transfers to defraud creditors * * *. In both cases the parties are in pari delicto and no relief will be granted the transferor in equity * * *. The equitable maxim 'he who comes into equity must come with clean hands' governs the court's action."

We consider the claim made by plaintiff here is analogous to those made by plaintiff in Shaw v. Addison, and our conclusion is the same as the one reached there. See also language in England v. England, 243 Iowa 274, 277, 51 N.W.2d 437, 439. We have no quarrel with decisions cited at this point by plaintiff (e.g., Carlson v. Smith, 213 Iowa 231, 236 N.W. 387, 80 A. L. R. 186) in which the conveyance was innocent of fraudulent purpose and it was held the grantor could compel reconveyance upon the happening of a named event.

But that is not the situation here. We are abidingly convinced the purpose here, if as claimed by plaintiff, was not innocent. Equity must leave the parties as it finds them. The decision of the trial court should be and is reversed.—Reversed.

All JUSTICES concur.