## Richmond.

### JORDAN v. MILLER AND ALS.

#### March 21.

1. In the case of a bill by a partner against his co-partners for a settlement of the partnership accounts, the statute of limitations will not begin to run whilst there are debts due to and by the partnership.

2. A parol contract of partnership without any fixed time for its continuance, and the business of which may be completed within a year, is not void as coming within the statute—Code of 1873, ch. 140, § 1.

3. Though one or more of the partners give their bond to a party with whom they had made a contract, which under their general authority as partners they were authorized to make, the debt is still a partnership debt, and binding on a partner who did not join in making the contract or giving the bond.

4. In August, 1859, four persons enter into a parol contract of partnership to purchase stock cattle in Tennessee and bring them to Virginia and sell them. They buy a large number, but when they bring them to Virginia they find the price is very low, and they cannot sell them at a profit, or obtain pasturage for them. Some of the partners then make contracts to sell, guaranteeing a certain profit at the end of the next year. HELD: Under the circumstances the sale with the guarantee was not in excess of the powers of the partners who made the sales; that it was a partnership transaction, and all the partners were bound by the contract.

5. An account having been taken showing the different debts of the partnership, the amount and to whom due, and showing how much each partner is to pay, the court may appoint a receiver with authority to collect from each partner the amount he is to pay, and apply the fund to pay the creditors.

In January, 1874, Benjamin F. Miller filed his bill in equity in the circuit court of Rappahannock county, in which he set out that in the year 1859 Eastham Jordan,

John Miller, James F. Brown and complainant entered into a co-partnership for the purchase and sale of cattle on equal terms as to profit and loss; that they purchased a large number of cattle and disposed of them; and as such partners they contracted liabilities, many of which were still outstanding, and complainant had advanced large sums in satisfaction of said liabilities. That there had been no settlement between complainant and his partners of said co-partnership, and that the accounts of and respecting the same are still open, depending and unliquidated. That James F. Brown, one of the partners, had been adjudged a bankrupt, and had received his discharge, and that F. M. Bruce had been appointed his assignee.

And making Jordan, John Miller, Brown and his assignee Bruce defendants, he prayed that an account might be taken of all the co-partnership dealings and transactions between the said partners, and of the debts and liabilities outstanding of said co-partnership, and also of debts due to it, and that what shall appear to be due to the complainant from the said partners may be decreed to him, and for general relief.

Jordan answered the bill. He said that a partnership between the parties mentioned in the bill was formed for the purpose of buying and selling *stock cattle;* that the powers of said partnership and of each of the partners was limited to this business; that beyond the purchase and sale of stock cattle the partnership agreement did not extend; that it was specially contracted and agreed by and between the said parties, that there should be no dealing in or purchase of cattle for the purpose of grazing; that the cattle purchased should be resold, as circumstances and the market would allow; that the costs and charges of transporting, feeding and caring for the stock cattle should be a charge upon the partnership; that the fund for the purchase, expenses, &c., should be advanced in equal proportion by the

several partners, and the profits and losses in like manner distributed. He says said partnership venture resulted in large profits, no part of which he has received. He has no personal knowledge of the partnership matters, its debts or its assets; but he is satisfied and avers that upon a just and fair settlement of the partnership account, all debts lawfully and equitably binding said partnership will be fully paid, and leave a surplus to be distributed according to the rights of said partners. He denies that there are any outstanding and unliquidated debts binding said partnership, or that the plaintiff has advanced monies and discharged debts due by the partnership; and for all matters not admitted in his answer he requires strict proof.

In June, 1874, the court referred the cause to a commissioner to enquire, 1st. Whether a partnership between the said parties was ever formed; and if formed, when entered into, what the scope, purposes and powers of said partnership, and when terminated. 2d. To state, settle and adjust a full and complete account of the actings and doings of the said partnership, showing what the input capital was, by whom advanced, when advanced, and how used and invested. 3d. Should said settlement of accounts show profits, that said profit be apportioned according to the rights of the partners, and if loss resulted from the venture, that said losses be distributed according to the terms of the partnership.

The commissioner made his report in February, 1876. In this report he fixed the termination of the partnership in February, 1860; the amount of outstanding debts yet due by the partnership on the 3d of January, 1860, at $5,960.74. He also states the losses of the partnership at $16,265.33, with interest on $9,600. Of this there was a loss of $8,000 on cattle sold on a credit and lost by the results of the war. He also states what each of the partners had paid and received, and for what each is liable to the cred-

itors of the partnership, and to the others to equalize their burdens.

The plaintiff excepted to the report fixing the time of the termination of the partnership; and the court sustained this exception.

The defendant Jordan filed fourteen exceptions to the report. Several of them refer to the insufficiency of the evidence to support items of the account, or indeed any account. He insisted that a debt reported as due to John T. Fletcher was not the debt of the partnership, but was the debt of the plaintiff and the other members of the firm who had given their bond to Fletcher for the debt. And he insisted further, as to this debt and others, and as to the loss of the $8,000 by the results of the war, that the several partners had made contracts with Fletcher and others by which they sold to them the cattle of the partnership upon a guarantee that if after keeping them until the next fall they did not sell them at a certain profit named, the vendor would make it up or take back the cattle and pay for the keeping of them. And this he insisted the said partners had no authority to do.

In March, 1870, after the commissioner had returned his report, Jordan filed the plea of the statute of limitations.

The cause came on to be heard on the 20th of March, 1878, when the court overruled all the exceptions of the defendant Jordan to the report of the commissioner, and decreed as follows:

"And it appearing to the satisfaction of the court, from the statements made upon pages twelve and sixteen of the said report, that the firm of Brown, Miller & Jordan are bound and pressed for the following debts, which constitute the entire unpaid debts of the said firm—to-wit: the sum of nineteen hundred and fourteen dollars and thirty cents, with interest on $1,155.69, from the 10th of August, 1871, to Johnson & Hall; six hundred and fifty dollars and

eighty-seven cents, with interest from the 10th of August,. 1871, on $649.58, to Davis & Williams; thirty-three hundred and ninety-five dollars and fifty-seven cents, with interest from the 10th day of August, 1871, on $2,409.51, to J. T. Fletcher; and that, after properly charging and crediting each one of the said firm, that the sums to be contributed by the members of the said firm will be as follows: By B. F. Miller, $409.12; by John Miller, $1,695.31; by Eastham Jordan, $3,611.93; with interest on each of the said sums from the 10th day of August, 1871.

"And it further appearing to the court, from the statement upon page 15 of said original report, that Eastham Jordan, after being charged with above stated *pro rata* of the debts, is still indebted to the firm in further sum of $244.38, with interest from the 10th of August, 1871, the court doth adjudge, order and decree, that the said B. F. Miller, John Miller, and Eastham Jordan do pay to E. T. Jones, who is hereby appointed a receiver for the purpose of collecting the same, the above mentioned *pro rata* share of the indebtedness of the said firm; and that Eastham Jordan do likewise pay to the said receiver the sum of $162.92, two-thirds of the said sum of $244.38, with interest as aforesaid; and the court doth further order the said receiver to deposit the sums collected by him to the credit of this cause in the First National Bank at Alexandria.

"The clerk of this court is ordered, when required by the said receiver, to issue executions against the said parties in favor of said receiver for the sums which they are herein ordered to pay.

"Before receiving any money under this decree, the said receiver is ordered to execute, before the clerk, bond in the penalty of $10,000, conditioned as required by law, with approved security.

"The said receiver is ordered to report to this court any collections made by him for its further action."

And thereupon Jordan applied to a judge of this court for an appeal and *supersedeas;* which was awarded. The facts are stated by Judge *Anderson,* in his opinion.

*R. T. Scott,* for the appellant.

*W. H. Payne,* for the appellees.

ANDERSON, J., delivered the opinion of the court.

In August, 1859, John Miller, Benjamin F. Miller, Eastham Jordan, and James F. Brown formed a partnership for purchasing in the west on speculation stock cattle, and bringing them to Virginia, and after supplying themselves respectively with such as they wanted for grazing—they were all graziers and kinsmen—the remainder they would sell at a profit.

Their purchases were made mainly by John Miller and James F. Brown, in the State of Tennessee, and amounted to 3,399 head. They probably calculated on being able to make quick sales in their neighborhoods for cash, and in that way to raise money to pay for them; and they seem to have engaged in the venture without providing any capital for the purpose, probably calculating upon raising the means necessary so certainly in the way indicated; and they hoped to sell off their stock for cash, pay for it, and to wind up the business in a little while, perhaps in the course of two or three months. But they were doomed to disappointment. Their cattle cost them, as appears from an account taken in this cause, the sum of $64,090.07, and they found the price of stock cattle ruling low, not much demand for them, hard to sell any way, difficult to get pasturage and subsistence for them; that they were a burden on their hands; that to sell at all they would have to sell to a great extent on long time; that the members of the

firm would have to advance their credits, and the firm itself to assume liabilities, and that they were involved in a business which could not be settled up in a few months, but which would perhaps require years. James F. Brown seems, by common consent of the co-partners, to have acted as the chief manager and financial agent of the concern, and soon the troubles of the war came on, which involved the company in heavy losses, and their financial agent in inextricable ruin and bankruptcy; and the business of the company not being settled up, but its liabilities being still considerable, which were bearing heavily and unequally on the members, and a large outstanding debt still due it, most of which was utterly lost. This bill was brought in 1874 by B. F. Miller against his co-partners and the assignee of James F. Brown, for an account of all the partnership dealings and transactions, and of the debts and liabilities outstanding of the co-partnership, and for a decree in his favor for what may appear to be due him.

The accounts were taken and the amount of the several debts still due by the company and of the assets of the company, which consisted mainly of a debt due from Eastham Jordan of an inconsiderable amount, and the amount which each of the three solvent partners would have to contribute for the payment of said debts, which would absorb the entire interest of each of them in the concern, and leave nothing due to either of them. And the amount which each of them should contribute for the payment of the debts being ascertained, the court rendered a decree against them severally for their *pro rata* share of the debts so ascertained, to be paid to E. T. Jones, who was appointed a receiver for collecting the same.

From this decree Eastham Jordan obtained an appeal to this court.

He assigns as error, first, the overruling of his plea of the statute of limitations. The court is opinion that there is

no error in the said ruling of the court below. In *Coalter* v. *Coalter*, 1 Rob. R. 79, the statute was successfully pleaded. But in that case Allen, J., said, "the partnership had terminated, and *all transactions with others* would seem to have been closed more than five years before the institution of this suit. There was nothing to show that any debts had been collected or paid within that period." And in the same case Stanard, J., said, "to subject a suit for the settlement of partnership accounts to the bar of the statute, it must not only appear that the partnership has ceased more than five years, but that there were no valid claims of debt or credit against or in favor of the partnership, paid or received, or outstanding within that period."

There never has been a formal dissolution of the firm of Brown, Miller & Co. On the 10th of August, 1871, the debts of the firm, unpaid and outstanding, amounted to $5,960.74, with interest on $4,214.78 till paid. That is, amount due on judgment of Davis & Williams, $650.87; Johnson & Hall, $1,914.30, and John T. Fletcher, $3,395.57—aggregating the above sum of $5,960.74, which is exclusive of amounts due to members of the firm. At the same time there appears to have been due the firm from Eastham Jordan $244.28, a valid debt, and from G. J. Browning $2,625.33, which was secured by a deed of trust on real estate, which is now believed to be of little or no value. The whole sum due the firm and unpaid on the 10th of August, 1871, as reported, is $16,265.33, with interest on $9,600, part thereof, the most of which is lost. This suit was brought on the 20th of January, 1874, and the foregoing credits, in favor of, to the extent that they were valid claims, and debts against the firm, being unpaid and outstanding within the five years next preceding the institution of the suit, upon the authority of the case above cited, which is supported by *Marsteller* v. *Weaver's Adm'r*, 1 Gratt. 391, it is not barred by the statute of limitations. Nor has there been, in our opinion, such

delays or laches on the part of the plaintiff in instituting his suit for the settlement of the partnership accounts, as that he ought not to be entertained in a court of equity for that purpose.

The contract of partnership was by parol, but the court is of opinion that it does not fall within the provision of the statute which prohibits the bringing of an action upon any agreement that is not to be performed within a year, unless it be in writing, and signed by the party to be charged therewith, or his agent. The agreements contemplated are such as by their terms have performance postponed beyond one year, and not such as may or may not chance to be performed within that period. 1. Minor's Institutes, 189–190; 2 Parson son Contracts, 316.

The court is further of opinion, that the contracts of sale of cattle belonging to the firm, and which were acquired by the firm in this venture, made with a guaranty, were binding upon the firm, although all the members of the firm were not present participating in and sanctioning such sales, and this, although it was the original purpose of the co-partners in associating themselves together to purchase stock cattle, to supply themselves respectively as graziers, and to sell the remainder for a profit, and although they may have contemplated that they would be able to sell them for stock cattle. There does not appear to have been any stipulation in their contract of partnership as to the manner in which they would dispose of the cattle, except that each partner should take from the lot they purchased such of them as he desired to have for grazing, and that the balance should be sold at a profit. It does not appear that they imposed on themselves a restriction that they should not be sold with a guaranty, which seems not to have been an unusual mode of disposing of cattle amongst the graziers of their section, nor with the parties themselves to this contract. It seems that some of them at least, and the

defendant Eastham Jordan himself, was not previously without experience in that mode of disposing of stock cattle. Nor does there appear to have been any restriction by the terms of their partnership agreement in exchanging stock cattle for fat cattle. It was evidently their plan and purpose, after they supplied themselves respectively with such as they wanted for grazing, to dispose of the remainder so as to realize from them the largest profits they could. It seems that Brown was the most active partner and financial agent of the concern. He seems to have been recognized by all his co-partners, Eastham Jordan as well as the rest. Each partner sold some of the cattle—Jordan fewer than any of them. B. F. Miller and John Miller had charge of a great many, and sold a good many, but Brown more than either. John Miller took a lot of them over into Fauquier county, a fine stock country, and found it an up-hill business in making sale of them. He could get no money, and had to sell such as he sold on a credit of twelve months, and had to bring many of them back, which he turned over to his brother, who was greatly burdened with them. It was difficult to find pasture and subsistence for them, and it seemed to be impracticable to sell them for money, for which they were greatly in need. The men from whom they purchased the cattle were pressing for their money. Each member of the firm gave his negotiable note for $3,000, which was discounted by the bank, and the money turned over to Brown to pay for cattle. The bonds and money received for cattle sold were also turned over to him, and he had the proceeds of the sales which he made himself, and seems to have sold the most that were sold. But all fell very far short of paying the large debt of $64,090.07, which the cattle had cost them. They had given the note of the company for $6,000 to one of the parties from whom they had purchased cattle, and large arrearages were due others. They had 595 head of cattle still on hand, which

they had been unable to sell. It was getting late in the season. They could get but scanty subsistence for them, and the cattle were losing every day. They succeeded finally in getting John T. Fletcher to take one hundred and twenty head at a good price in cash, by agreeing to guarantee to him a certain profit, or take the cattle back at the end of twelve months, and to return him the money he had advanced, and pay him in addition what they guaranteed as a profit for wintering, pasturing and fattening them. For the amount which they agreed to pay him at the end of twelve months and take the cattle from him, James F. Brown gave his bond, which was afterwards signed by B. F. and John Miller. Several lots of cattle were disposed of in a similar way to different parties, among others to Absalow Jordan, thirty head, which was probably the first contract of the kind that was made for cattle belonging to the firm, and that contract was made by Eastham Jordan, the appellant, and F. B. Miller—the said Jordan thus giving his sanction to the plan.

But suppose it was the understanding of these parties when they formed this partnership association that after they supplied themselves respectively with cattle for grazing, they would sell the remainder for cash to the neighbors around them, and wind up the business in two or three months. What were they to do if they could not be sold? Did not the obligation rest upon Jordan as much as upon the others, and could he withdraw and refuse to aid and co-operate in carrying out the plan, and hold his co-partners responsible to him for being unable to accomplish it? Each partner is bound to contribute his skill and exertions to the common object. After the disposal of the 275 head in the way mentioned, there remained 320 head undisposed of, which would be utterly lost, as F. B. Miller testifies, unless the members of the firm would divide them among themselves, and it was proposed to divide them into four

parts, each one taking one-fourth. All agreed to it except Eastham Jordan, who rode off and refused to take any. Brown was prevailed on to buy Jordan's lot, and he was sent after and brought back, and agreed that Brown might take them.

In purchases and bargains relating to the partnership, the act of one is considered the act of all, and that each may contract as if he were the authorized agent of the rest, and bind all by dealing within the scope and nature of their business. Gow on Part. 71; *Willet* v. *Chambers*, Cowp. R. 814; *Walden* v. *Sherburne*, 15 Johns. R. 409. In extraordinary cases, an extraordinary use of power must be made. What is called the course of trade is not confined to what is called the most usual way of doing business, in the usual state of things. *Tapscott* v. *Weaver*, 9 Leigh, 424. In *Anderson & Wilkins* v. *Thompkins*, 1 Brock R. 456, Chief Justice Marshall said, "If the necessity be apparent, if the act be justified by its motives, if the mode of sale be such as the circumstances require, I cannot say that the partner has exceeded his power."

We are of opinion that the sale of the 275 head of cattle with the guaranty, and the contingent obligation to take them back and pay for them, was not in excess of the powers of the partners who made the sales; that it was a partnership transaction, and that the execution of the bond for the amount assumed by three of the partners did not extinguish the partnership liability, or release Eastham Jordan, the appellant, from his liability therefor. In *Weaver* v. *Tapscott*, 9 Leigh, 427, it was held that the liability of a partner was not extinguished by the execution of his co-partner. Judge Cabell said also that Weaver was equally liable if Tabscott at the time of the contract was ignorant of the fact that Weaver was a partner. Upon that holding it was immaterial whether J. T. Fletcher knew or not, at the time of the contract, that Eastham Jordan was a partner.

It only remains to say that the court is of opinion that the circuit court did not err in appointing a receiver. The creditors who were entitled to the money were not parties to the suit, and we do not think that the court exceeded its powers, or exercised its discretion improperly in appointing a receiver to collect the money.

The court has been unable to discover that the account taken by the commissioner, upon which the decree is based, is not supported by the evidence; but is of opinion that it is so supported. Upon the whole the court is of opinion that there is no error in the decree of the circuit court, and that the same must be affirmed.

DECREE AFFIRMED.