419 P.2d 531

**Violet Rector BRAND, Appellant,**

v.

**Kaye A. ELLEDGE, Appellee.**

No. 7733.

Supreme Court of Arizona.

In Banc.

Oct. 27, 1966.

Rehearing Denied Nov. 22, 1966.

Alan Philip Bayham, William R. Peterson, Phoenix, for appellant.

John P. Frank, John J. Flynn, Lewis, Roca, Scoville, Beauchamp & Linton, Phoenix, for appellee.

McFARLAND, Justice.

This is an appeal from a judgment of the Superior Court of Maricopa County finding in favor of the defendant, on remand directed by opinion of this court in Brand v. Elledge, 89 Ariz. 200, 360 P.2d 213. At that time we reversed a motion to dismiss granted by the trial court in favor of the defendant at the close of the plaintiff's

**354**

case. The action was brought by Violet Rector Brand, hereinafter designated plaintiff, against Kaye A. Elledge, hereinafter designated defendant, for an accounting and dissolution of a partnership.

In the first trial the lower court "dismissed the action upon defendant's motion on the ground that the partnership agreement was illegal and void". In passing upon this question, we held, under the record before us at that time, that plaintiff and defendant had entered into a valid partnership agreement, and the defendant having plead the statute of limitations and laches, this court remanded the case and instructed the trial court "to set aside the order of dismissal and permit the parties to present evidence on this question."

However, the defendant, in the first case, had also plead that a partnership had not been entered into, and the motion to dismiss having been granted at the close of plaintiff's case, the court, in the second trial, properly permitted defendant to introduce testimony upon this issue. At the close of defendant's case, the trial court, in support of its judgment in favor of defendant, made findings of fact and conclusions of law, parts of which plaintiff complains on this appeal as follows:

"2. The money paid by the defendant for the down payment and for the remodeling was paid by the defendant with monies received by the defendant from her relatives and from the Valley National Bank. The balance of the purchase price was secured by a mortgage which was paid by the defendant.

*   *   *   *   *   *

"4. At no time was any money, goods or services contributed by the plaintiff to the defendant which was in any way connected with the purchase, remodeling or operation of the Happy Landings.

"5. A ficticious name certificate was recorded with the County Recorder of Maricopa County by the plaintiff and defendant, for the purpose of declaring plaintiff's interest in the name 'Happy Landings,' but no written or oral agreement of partnership was ever entered into between the plaintiff and the defendant.

*   *   *   *   *   *

"7. Personal loans were made by the plaintiff to the defendant, and were repaid by the defendant, but the plaintiff at no time made any capital contribution to the business or paid any sums for the acquisition of an interest in the business.

*   *   *   *   *   *

"10. Plaintiff continued to reside in Phoenix, Arizona from the date of the commencement of the operation of Happy Landings Tavern until February of 1945, at which time she returned to New York where she remained until 1949. Plaintiff returned to Phoenix for a short period of time in 1949, and then went to San Diego, California, where she married one John Brand, and resided in San Diego until 1951 when she returned to Phoenix, and remained in Phoenix until 1953. In 1953 the plaintiff accompanied her husband, who was a serviceman, to Tokyo, Japan, where she remained until the latter part of 1955. In 1955 she returned to Phoenix where she has resided until the present time. During this entire course of time until this action was filed in 1956, the plaintiff expressed no interest in the operation or management of the Happy Landings Tavern. She made no inquiries of defendant concerning the business welfare, operation, improvements or profits. She at no time was advised by the defendant concerning any of these matters.

"11. By virtue of the failure of the plaintiff to bring this action until some 15 years after the commencement of the operation of the Happy Landings Tavern, the defendant was prejudiced in the defense of this action, in that numerous witnesses who might have testified favorably for the defendant were deceased, or otherwise unavailable, and many of the records helpful to the de-

fense of this action were lost or discarded.

\* \* \* \* \* \*

"(5) No partnership relationship, express or implied, existed between the plaintiff and the defendant.

\* \* \* \* \* \*

"(7) By reason of the plaintiff's delay in asserting her claim, the defendant has been placed in a disadvantageous position, whereby the ability of the court to do full justice to the parties has been substantially impaired, and therefore the plaintiff's claim, if any, is barred by laches."

In the earlier opinion we found that:

"\* \* \* the parties, at the suggestion of the defendant, went to the county recorder's office and signed and filed a certificate of partnership between themselves, reciting that they were doing business under the style and fictitious name of Happy Landings, located at 3815 South Central Avenue, Phoenix, Arizona. The certificate did not recite the terms of the copartnership." 89 Ariz. at 201, 360 P.2d at 214

Defendant, in presenting her case, did not deny signing the agreement above referred to, nor did she claim any circumstances of fraud or misrepresentation surrounding its creation. The only explanation offered by the defendant was the following testimony:

"THE WITNESS: This Fictitious Name Certificate which, then as now, is to me what it certainly certifies at the heading of it as a Fictitious Name Certificate.

"At this particular time in New York City, which we were speaking of, Mrs. Rector, Otto Kretchmer and another gentleman had an occasion to visit a bar out of Jersey City, and there was a very attractive bar in there, and the decor was all of airplanes and various things like this, and we were discussing—I don't know—I am sure that Pat heard some of the conversation—and we were all discussing what a very good and cheap way it would be to use decor in a bar, and since I had spent so many years of my life in playing and working in a bar, I said I would like to have a bar some day, and because of the name and because of the cheap decor you could start something up very easily without too much expense.

"And Pat said, 'Well, gee, I sure would like to do that.'

"And I said, 'Well, so would I.'

"And when we were discussing the possibility of either one of us, not jointly, ever owning a bar, and it was about that time that I decided to come back to Arizona, and we had discussed the name of Happy Landings because it is a catchy name or was a catchy name, and I liked it, and Pat and I agreed—this happened before I even had any money or help in getting and acquiring the Broadway Inn—that whoever got a bar first they could use this name.

"Now, if Mrs. Rector had gotten a bar or had made an effort to get a bar, I wouldn't have argued with her about using the name 'Happy Landings.' I could have used any name.

"Q Did you ever have a conversation with her at the time this Fictitious Certificate was formed?

"A Yes.

\* \* \* \* \* \*

"Q BY MR. FLYNN: When was the conversation, if you had a conversation?

"A We had several conversations.

"Q When were these—where were those—these conversations?

"A One was at her home, and they could have been in the LaLonie, could have been in the South Seas, could have been anywhere. We discussed the fictitious name being Happy Landings on several occasions.

"Q And what were the contents of these conversations?

"A That whoever got a bar first we'd like to copyright the name so that no one else would use it.

"Q And in relation to this particular certificate at the time it was executed, did you have a conversation with her about that particular fictitious name certificate?

"A Yes.

"Q And what was that conversation?

"A It was that they were going to copyright the name so no one else could use it as there was an airport on 16th Street and everything was all air-minded at this time, and it was a suggestion that we do copyright the name just to keep it as a name.

"MR. BAYHAM: May we have a statement as to who was present?

"Q BY MR. FLYNN: Was there anybody present at this time?

"A Yes.

"Q Who?

"A Chuck Newton.

"Q Is that the Chuck Newton who has previously testified?

"A Yes, sir."

The testimony of C. V. Newton, referred to by defendant above, was as follows:

"Q Did you have occasion to have a conversation with Mrs. Brand and Miss Elledge concerning the name of the establishment?

"A I did.

"Q Where did this conversation take place, please?

"A They were talking about some stationery and name and so forth.

"Q And about when was that?

"A I think it was just about the time it opened up.

"I can't give you the date on it. I wouldn't know unless I had records to go back to.

"Q Would you say it was about the time it was opened up?

"A Right.

"Q Would you relate, Mr. Newton, to the best of your recollection, what the conversation was that you had at that time?

"MR. BAYHAM: Now, who was present in that conversation? Did I miss it?

"THE COURT: The plaintiff and defendant.

"Q BY MR. FLYNN: Who was present at the conversation?

"A Kaye Elledge, Mrs. Brand and myself.

"Q Would you relate, then, the conversation?

"A The conversation came up—they were going to put a name on it and call it 'Happy Landings.' They wanted some name to call it, so it wouldn't be called 'Joe's Place,' or something that way, and at the time due to all the influx of the military these places were springing up quite frequently around town.

"I said, 'If you have got a good name you better take care of it and protect it and go down and see about getting a copyright on it just to protect the name of the place.'

"That is all, the fictitious name for the establishment.

"Q At any time in your associations or conversations · with Miss Elledge and Mrs. Brand and in your association and connection with the Happy Landings did you at any time ever have any information from Mrs. Brand or from any other person that in any way indicated that Mrs. Brand had any interest in the Happy Landings?

"A No, I was never that close."

The trial court's findings of fact in the instant case recite that the "fictitious name agreement" was recorded with the County Recorder of Maricopa County by the plaintiff and defendant, for the purpose of declaring plaintiff's interest in the name "Happy Landings." The document itself provides as follows:

"We, Kaye A. Elledge and Violet Rector, do hereby certify that we are conducting a business known as the 'Happy Land-

ings', located at 3815 South Central Avenue, Phoenix, Arizona."

Both plaintiff and defendant subscribed to the above mentioned document, dated August 13, 1941.

During January of 1942 the defendant drew up in her own handwriting amounts owed to the plaintiff, which provided that it was "a legitimate and true statement of debt owed to Patricia O'Hara Rector by 'Happy Landings' and K. A. Elledge," and further that "Happy Landings [was] in debt to Patricia O'Hara Rector . . . $11,797.35", the amount of the settlement.[1]

Defendant does not dispute that she drew up the paper, nor does she dispute either the figures on it or her signature. She claims the paper was drawn up by her because of blackmail threats made by the plaintiff based upon certain letters written to the plaintiff by the defendant. Defendant denies the plaintiff ever put up the money referred to in the instrument, either as capital for the creation of a partnership, or as a loan to defendant. Defendant's evidence of blackmail is at best an unconvincing argument. The document evidencing an intent to form a partnership, coupled with the statement of the amounts owed plaintiff, both signed by defendant, leave no room for speculation that there was in fact a partnership entered into between plaintiff and defendant.

The instrument itself would not indicate that it was drawn up because the plaintiff blackmailed defendant. It sets out in detail the dates and amounts of money as advanced and corroborates the testimony of plaintiff in certain respects. Plaintiff testified that the $7,150 portion of the money advanced was part of $8,000 which she had brought to Phoenix. Other advances were made from time to time with the dates set forth. The instrument is in writing, in the

handwriting of the defendant, and signed by defendant. It does not seem reasonable that defendant would have enumerated definite dates with amounts even to cents if she were not taking it from the records.

The blackmail which defendant mentions refers to some letters which she states were returned to her, claiming the plaintiff threatened to give them to her parents. Yet she admits, herself, that she wrote similar letters after the alleged blackmail, which letters were introduced in evidence.

Defendant seeks to make her claim of blackmail more plausible by testifying that she paid $5,000 at a later date for the letters which she received at that time. However, she showed no connection between this agreement and the drawing up of the first instrument, nor was the instrument returned to her at the time of the alleged payment. The only corroboration of the payment of this $5,000 was testimony by her own bartender who stated he saw defendant give plaintiff some money and plaintiff gave the defendant some papers. Plaintiff, in her testimony, denied that she received $5,000 from defendant.

We do not consider this type of evidence sufficient to refute that contained in the written instrument signed by defendant. The burden is on the person who claims failure of consideration in a written instrument to establish it by a preponderance of evidence. A.R.S. § 44-121; Dunlap v. Fort Mohave Farms, Inc., 89 Ariz. 387, 363 P. 2d 194; Sisson v. Janssen, 244 Iowa 123, 56 N.W.2d 30; Korabek v. Weaver Aircraft Corporation, 65 Cal.App.2d 32, 149 P.2d 876. This the defendant failed to do. The evidence substantiates the previous interpretation by this court of these two written instruments.

"Admittedly, the parties did intend to operate the Happy Landings Tavern as

---

1. Plaintiff's Exhibit "C", introduced in evidence, and purporting to be an accounting in defendant's own handwriting, shows a balance as follows: "Jan. 12 Bal. owing Patricia O'Hara Rector $11,797.35". And on the back thereof:

"From Sept. 1941 to Jan. 1942 These papers are a legitimate and true statement of debt owed to Patricia O'Hara Rector by 'Happy Landings & K.A. Elledge. (Signed) K.A. Elledge"

copartners. Their certified declaration to this effect is recorded. Admittedly, the plaintiff did invest some $11,700 in the business for which she has had nothing in return. * * *" Brand v. Elledge, supra, 89 Ariz. at 206, 360 P.2d at 218.

Where the trial court makes findings of fact, the scope of review of these findings on appeal is governed by Rule 52(a), A.R.C. P., 16 A.R.S.:

"Rule 52. Findings by the court

"52(a) Effect. * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. * * *"

Where a finding of fact is "clearly erroneous" it is our duty to set it aside. Merryweather v. Pendleton, 91 Ariz. 334, 372 P.2d 335; Brown v. City of Phoenix, 77 Ariz. 368, 272 P.2d 358.

In the first opinion we construed the business agreement, signed by both plaintiff and defendant, and filed with the county recorder on August 13, 1941, to be a partnership agreement. This instrument stated that plaintiff and defendant were conducting a business known as the "Happy Landings." The finding of the lower court that this instrument was entered into "for the purpose of declaring plaintiff's interest in the name 'Happy Landings' " changes and alters the express terms as written in the agreement, and the meaning as construed by this court in the first appeal.

The document recorded by plaintiff and defendant is clear and unambiguous. The lower court's finding that the agreement was entered into to "protect" the name "Happy Landings" clearly is based solely upon the testimony of defendant. There is no other evidence that this was the intent of the parties.

The law is clear that parol evidence may be used to explain an ambiguous contract, but in the absence of fraud or mistake, it may not be used to change, alter or vary the express terms in a written agree-ment. Komarek v. Cole, 94 Ariz. 94, 381 P. 2d 773. There is no claim made of either patent or latent ambiguity in the instrument, and we find no other conclusion is possible than to reaffirm our position as stated in the earlier opinion that there was a partnership entered into between the plaintiff and the defendant, as evidenced by the recorded instrument.

Defendant presented various witnesses familiar with the "Happy Landings" and plaintiff and defendant during 1941, whose testimony amounted to a showing that they had no knowledge that plaintiff and defendant were partners. The fact that one partner, with the knowledge and permission of his copartner, assumes sole control of the business and partnership assets in his individual name does not constitute him sole owner as between himself and his partner. 68 C.J.S. Partnership § 176.

Having determined the existence of a partnership between plaintiff and defendant, the next matter to be considered is the time of dissolution. The partnership was one at will. Thus, having no fixed time for continuance, it could be terminated at any time. Costello v. Gleeson, 15 Ariz. 280, 138 P. 544. A partnership may be dissolved by a private settlement and account. Pejsa v. Bridges, 69 Ariz. 315, 213 P.2d 473. The instrument executed by defendant in 1942, recognizing the existence of a debt owed to the plaintiff by the defendant is indicative and capable of being construed as such a private settlement and account. The plain and unambiguous meaning of the words used indicate an acknowledgment by the defendant of a specific amount owed plaintiff, and the words used are not couched in the manner of an annual partnership financial statement.

This instrument, construed with the uncontradicted testimony of both plaintiff and defendant that during the period following the execution of this instrument the plaintiff had little or nothing to do with defendant and the "Happy Landings", leads us to the necessary conclusion that the relationship must have terminated at this time.

Defendant, in her answer, set up the defenses of laches and the statute of limitations. Examination of the transcript and record presented by the defendant reveals the defense was directed particularly at attacking the existence of the partnership, and very little evidence was adduced concerning the defense of laches or statute of limitations. With reference to these defenses, in Younis v. Griego, 72 Ariz. 369, 236 P.2d 358, we stated:

"  *   *   * The statute of limitations applicable, and we refer to section 29–204, A.C.A.1939, reads as follows:

" 'There shall be commenced and prosecuted within four (4) years after the cause of action shall have accrued, and not afterward, the following actions:

\*      \*      \*      \*      \*      \*

" '2. By one partner against his co-partner for a settlement of the partnership account,  *   *   *'

"From 68 C.J.S., Partnership, § 414, we quote: 'The right to maintain a suit for a partnership accounting may be lost through laches, especially where, by reason of plaintiff's long delay, evidence has been lost, or defendant has been placed in a disadvantageous position, or it has become impossible for the court to do full justice to both parties. Whether or not plaintiff is chargeable with laches is a matter to be determined according to the circumstances of the particular case,  *   *   *'

"Applicable to assignment No. 4, we quote from 40 Am.Jur., Partnership, section 334, as follows: 'The mere lapse of of time, apart from the statute of limitations, may give rise to a presumption that the accounts have been adjusted and settled, and therefore, unreasonable delay or laches is sufficient to destroy the right to an accounting.  *   *   *' Also, applying to assignment No. 5, we quote from 40 Am.Jur., Partnership, section 333, as follows: 'The right of a partner to have an accounting of the partnership affairs may be lost by the operation of the statute of limitations when made applicable to actions therefor, or by delay amounting to laches. No hard and fast rule can be laid down as to the time from which the statute of limitations runs on the right of a partner to have an accounting. The time when the right of action to sue for the settlement of partnership affairs accrues, so as to set the statute of limitations in motion, depends upon the circumstances of each particular case.  *   *   *' " 72 Ariz. at 373, 236 P.2d at 360

Considering first A.R.S. § 12–544, the statute of limitations quoted in part in Younis v. Griego, supra, provides:

"§ 12–544.  *   *   * partnership account;  *   *   * four year limitation

There shall be commenced and prosecuted within four years after the cause of action accrues, and not afterward, the following actions:

\*      \*      \*      \*      \*      \*

"2. By one partner against his copartner for a settlement of the partnership account,  *   *   * and the cause of action shall be considered as having accrued upon a cessation of the dealings in which they were interested together."

◼ The issue presented in determining whether the statute has run is what in fact constitutes "a cessation of the dealings in which they were interested together." If such a cessation occurred upon dissolution, then plaintiff's suit is barred.

In Hodge v. Kennedy, 198 Va. 416, 94 S. E.2d 274, the Supreme Court of Appeals of Virginia, in considering a statute of limitations having a clause identical to A.R.S. § 12–544, stated:

"Rhea's administrator, his heirs and distributees invoke § 8–13, Code 1950, and assert that its five year limitation bars the debts owing to Haskell's administrator and Edenton's executor. The pertinent provisions of that section follows:

" 'Every action to recover money which is founded upon an award, or on any contract, other than a judgment of recognizance, shall be brought within the fol-

lowing number of years next after the right to bring the same shall have first accrued, that is to say:

\* \* \* \* \* \*

" 'If it be upon any other contract express or implied within three years, unless it be an action by one partner against his copartner for a settlement of the partnership account \* \* \* in \* \* \* which cases the action may be brought until the expiration of five years *from the cessation of the dealings in which they are interested together, but not after;* \* \* \*.' [Emphasis added]

"Appellants insist that 'the cessation of the dealings in which' the partners were interested together was when the payments and deeds of trust were made and executed on February 19, 1929.

"The evidence shows that on February 19, 1929, the partnership ceased to engage in the business that it had theretofore actively conducted and that on April 13, 1931, it was dissolved by the death of Haskell. Section 50–29, Code 1950 [2].

2. All citations to Title 50, Code 1950, are to The Uniform Partnership Act.

Yet the dissolution did not terminate the partnership, for under § 50–30, Code 1950, that continued until the winding up of its affairs was completed. After February 19, 1929, a boiler and engine were sold by Edenton who had been left in charge of the partnership affairs and property, and in 1946 and 1949, timber was sold from the partnership lands. In 1952 a substantial sum was derived from the sale of an option to purchase partnership property, and the sums derived were credited upon the partnership debt. During this period Edenton had been paying the taxes on the land and the trust deed executed by the partners and in which they were interested was not paid off or released until 1949.

"In *Foster's Curator v. Rison*, 17 Grat. 321, 334, 58 Va. 321, 334, the court construed the phrase 'the action may be brought until the expiration of five years from the cessation of the dealings in

which they are interested together, but not after,' and said:

" 'The time prescribed by the statute does not begin to run as to any of the partnership *dealings* until there has been a *cessation* of all of them. But what acts are comprehended in the word "dealings" in the meaning of the Code, may be a question of some doubt. Is the word confined to the active operations of the partnership during its continuance, or does it embrace also any act done after its dissolution in winding it up; such as the collection or payment of outstanding debts due to or by the firm, and even good debts due to the firm, outstanding when the suit is brought? I think the word should be construed in the latter and extended sense; otherwise no action or suit could be brought for a settlement of a partnership account after the lapse of five years from the dissolution of the partnership, although its business may not have been wound up for a long time thereafter.'

"Other decisions and authorities approve and are in accord with this interpretation of the statute. Marsteller v. Weaver's Adm'x, 1 Grat. 391, 42 Va. 391; Jordan v. Miller, 75 Va. 442, 14 M.J., Partnership, § 56, p 256, and cases cited; Riddle v. Whitehill, 135 U.S. 621, 10 S.Ct. 924, 34 L.Ed. 282." 94 S.E.2d at 279.

Hodge v. Kennedy, supra, involved construction of provisions of the Uniform Partnership Act, A.R.S. § 29–201 et seq., adopted in Arizona in 1954, and, specifically, § 50–30, Code of Virginia 1950, presently found in A.R.S. § 29–230:

"Partnership not terminated by dissolution

"On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

It will be noted the instant partnership agreement and subsequent dissolution occurred prior to adoption of the U.P.A. in Arizona. The U.P.A. was an attempt to codify the existing common law of partnership. In re Safady Bros. (D.C., W.D.Wis.),

228 F. 538. The rule enunciated in A.R.S. § 29–230 has been adopted and applied in jurisdictions prior to the enactment of the U.P.A. Wilson v. Hoover, (Missouri U.P.A. enacted in 1949), 342 Mo. 1182, 119 S.W.2d 768; Shapira v. Budish (Massachusetts U.P.A. enacted in 1923), 275 Mass. 120, 175 N.E. 159. We therefore conclude the reasoning set forth in Hodge v. Kennedy, supra, is applicable in the instant case, although the rights and liabilities arose prior to enactment of the U.P.A. in this state.

The evidence shows the dissolution of the partnership occurred on January 12, 1942 at the time the settlement of account was drawn. But, this dissolution did not terminate the partnership because dissolution does not necessarily result in immediate termination. Hodge v. Kennedy, supra. There was to be a type of continued existence until such time as distribution would be made of the firm assets in accordance with the agreement.

The evidence presented by both parties was to the effect that in 1942 the partnership assets amounted to considerably less than the $11,797.35 indicated as owed to plaintiff by defendant and "Happy Landings" at that time. Nowhere does defendant testify she paid plaintiff this amount, nor does plaintiff present any evidence of any payment. Defendant presented the evidence of the alleged blackmail, and testified she paid plaintiff $5,000 as a result of the blackmail. As stated above, this story is not supported by the evidence. Plaintiff's uncontradicted testimony is to the effect that every time she sought information concerning the profits of the "Happy Landings" she was informed there were none, or that any profits made had been reinvested in the business.

■ The intent of the parties was not to liquidate the assets of the partnership at the time of the dissolution, but that the defendant should pay the plaintiff out of profits. Certainly the nature of the relationship between the plaintiff and defendant, which we commented upon in our earlier opinion, gives rise to the necessary implication that plaintiff relied upon defendant for information concerning profit and loss, and this, coupled with the admitted lack of business acumen on the part of plaintiff, explains the failure to demand more stringent payment in settlement of the amount due her. The record is clear that the "Happy Landings" was still in existence in 1956 when plaintiff filed the instant suit. In light of these circumstances we hold there was no cessation of dealings prior to filing of the suit and plaintiff's claim is not barred by A.R.S. § 12–544.

■ The final point for determination is whether plaintiff's claim for an accounting and dissolution is barred by laches. The circumstances of each case determine whether laches bars recovery in a suit to have an accounting of partnership affairs. Younis v. Griego, supra. In such an action the general rule is that as long as the partnership exists failure to demand a partnership accounting does not amount to laches. Englestein v. Mackie, 35 Ill.App.2d 276, 182 N.E.2d 351; Caveney v. Caveney, 234 Wis. 637, 291 N.W. 818; Wiley v. Wiley, 115 Md. 646, 81 A. 180. The mere lapse of time does not constitute laches. Hodge v. Kennedy, supra; Sibert v. Shaver, 111 Cal. App.2d 833, 245 P.2d 514. The existence of a confidential relationship between partners is an important circumstance in determining if the delay constitutes such laches as to defeat any right to an accounting. Bankers' Trust Co. v. Riter, 60 Utah 1, 206 P. 276. To make the doctrine applicable it must appear the one interposing it as a defense has suffered prejudice by virtue of delay in instituting the action. Stewart v. Grant, 126 Me. 195, 137 A. 63.

■ In the instant case the doctrine of laches sought to be interposed is not applicable for the reason the plaintiff has not been lax in seeking an accounting, but any laxness must be found in her failure to enforce collection of the settlement made in 1942. Therefore, we must examine the position of the parties with respect to the

amount found due plaintiff from defendant at that time.

The defendant's answer set up the defense of laches to the claim of the plaintiff that there was in fact a relationship of partnership between the parties. Nowhere in the answer does the defendant claim laches prevents or hinders the enforcement of the settlement of accounts entered into in 1942. The specific amount owed plaintiff by virtue of that settlement is without question.

By virtue of the testimony introduced during the trial, it is clear the parties did not contemplate immediate payment of these amounts, and as noted above, the particular relationship existing between plaintiff and defendant explains the failure of plaintiff to attempt enforcement of the settlement until 1956. Certainly the condition of defendant has not changed to her detriment with respect to the payment of the $11,797.-35. The evidence introduced during the trial indicates a very large increase in her net worth, rather than any loss during this period. She is now in a better position to pay plaintiff than at the time of the settlement, or shortly thereafter. Defendant's testimony indicates the present value of the "Happy Landings" tavern is in excess of one hundred thousand dollars. The failure of plaintiff to seek the sums specified has not resulted in circumstances prejudicial to defendant. The defense of laches is not applicable and does not bar plaintiff's right to recover.

We therefore hold the lower court was in error in entering judgment in favor of the defendant, and we hereby reverse the judgment of the lower court and order judgment to be entered in favor of the plaintiff in the amount of $11,797.35, plus 6% interest from January 12, 1942.

BERNSTEIN, V. C. J., and UDALL, J., concur.

STRUCKMEYER, C. J., dissents.
NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this appeal.