440 P.2d 1006

Belle DECK, a widow, Appellant,

v.

Reinhold HAMMER, dba Hammer Well Drilling Company, Appellee.

No. I CA–CIV 474.

Court of Appeals of Arizona.

May 16, 1968.

Rehearing Denied June 12, 1968.

Review Denied July 12, 1968.

**468**

Neil C. Clark and Lester J. Hayt, Phoenix, for appellant.

Richmond, Ajamie & Fay, by William J. Richmond, Phoenix, for appellee.

CAMERON, Chief Judge.

This is an appeal by the defendant from a judgment of the Superior Court sitting without a jury in favor of the plaintiff in the amount of $3,505.00 for "drilling services rendered" and $4,000.00 for plaintiff's attorney fees.

We are called upon to determine:

1. If the findings of fact and the judgment are supported by the evidence.

2. If the trial court was correct in denying certain counts of defendant's counterclaim.

The facts necessary for a determination of this matter on appeal are as follows. In November of 1963 the plaintiff doing business under the firm name and style of "Hammer Well Drilling Company", as the contractor, and the defendant Belle Deck, as owner, entered into an agreement for the drilling of a water well upon defendant's property in Yavapai County, Arizona. The contract contained the following provisions:

"That the Contractor is an experienced driller and has a drilling rig and all necessary equipment, in good operating condition, required to drill a 10-inch well to a depth of 1,000 feet, and Contractor agrees to drill said well on Owner's land at the specified site, for the consideration and subject to the terms and conditions herein provided.

"1. The site of the well shall be designated by Owner herein. The bore of the well shall be 10 inches in diameter, as deep as practicable, and not less than eight inches when diameter is reduced. The well is to be cased with eight-inch 0.277 casing, and shall be serviceably straight, round and aligned, and in all respects sufficient to accomodate the installation and operation of pumping equipment designed for use in a well having a diameter of eight inches and a depth of 1,000 feet.

"2. The Contractor shall provide the drilling rig and all equipment needed for drilling the well, and shall furnish the well casing and casing shoe, and all material and labor required to complete the well in a workmanlike manner and according to standard practices and specifications as herein provided.

\* \* \* \* \* \*

"4. This contract is predicated upon the assumption that no highly resistant rock formations will be [sic] encountered in the drill hole, but should granite, basalt, or like formations be encountered in which two feet of depth or less per hour is the maximum that can be drilled during an eight-hour test, either party shall then have the right to terminate this contract, and the Contractor shall be paid at the contract rate as herein provided, for the total number of feet of the then completed depth of the well. If drilling is thereafter resumed, it shall be on an hourly basis at a cost to be agreed upon by the parties hereto.

"5. The entire drilling operation, and all that is required to be done in connection therewith, shall be under the complete and exclusive control of the Contractor, and the Owner shall have no liability of any kind or nature arising out of the performance of the work to be done hereunder or for any material or labor used or employed in connection therewith, other than to pay the contract price as herein agreed upon completion of the well."

The contract further provided that the owner should have several options regarding payment. Plan 1 provided for $7.50 per foot for each "foot of depth cased" and $5.00 per foot for any part of the "well not cased". Plan 3 provided that in the event the owner purchased the "cas-ing" and the "casing shoe" the contractor would then drill the well "according to specifications as herein provided, and place the casing in the well, at a cost of $5.00 per foot, complete, of drilled depth". The contract provided also:

"Should lawsuit or liens be required to collect the compensation for the work the Owner shall be liable for the expenses incurred in same, including attorney's fees and court costs."

The contractor proceeded to drill the well with a 10-inch drill-bit to a depth of 530 feet, although the 10-inch casing was installed to 460 feet only. From 530 feet on he used an 8-inch drill-bit. At 580 feet there was difficulty which the contractor indicated made it necessary to provide additional casing. A discussion arose between the contractor and the owner regarding extra payment for this work. The contractor testified:

"A Yes, sir, right, because I was already drilled down to 580 feet without tools but this 525 was impossible to underream with underreaming tools and had to be drilled with solid tools to get the casing past. And I worked seven weeks on that to get it accomplished. We couldn't see in there to see what was holding it but every time the casing went down it stopped.

"Q You were at 580 with your drilling when you asked for this $1,000 for trouble at 525 feet, is that your statement?

"A Yes. It was to remedy that situation to get the 8-inch casing past.

"Q But you actually drilled to 580?

"A Yes."

The dispute at this point was settled with a payment of $1,000 to the contractor. At 600 feet the contractor encountered trouble in a "hard rock" formation, and for about 100 feet it took him some 50 hours to drill. The contractor was drilling with an 8-inch bit at this time. In order to install an 8-inch casing it would be necessary for him to underream the 100 feet, which would consume approximately the same amount of time as the initial drilling of the said 100 feet. Also, the contractor had drilled into a sand and gravel formation at 700 feet that would have to be cased off before the drilling could proceed. The contractor then went to the appellant and informed her of this problem. On 11 March the parties entered into a supplemental agreement titled "Modification of Well Drilling Contract" which contained the following:

"Whereas the Contractor on or about the 30th day of November, 1963 entered into a contract with Belle Deck, of Congress, Arizona, to drill a well 1,000 feet deep, or until the bore of the well reached rock formation of such hardness that in a period of eight hours' drilling not more than two feet of depth per hour could be drilled; whereupon the contract could, at the option of either party, be terminated;

"That the Contractor has drilled said well to a depth of 700 feet and cased the same with 8-inch casing to a depth of 601 feet;

"That the drill hole has now reached a formation of sand or gravel that has resulted in caving to such an extent as to make it impracticable to complete the well with 8-inch casing, as required in the original agreement; however, the well can be completed with 7-inch casing.

"The Owner, Belle Deck, has agreed and does hereby agree that the Contractor can complete the well below the depth to which the well is now cased with 7-inch O D O. 277 casing instead of 8-inch casing as required in Paragraph 1 of the above mentioned agreement, and that when the well has reached a depth of 1,000 feet and is cased with 8-inch casing to a depth of 600 feet and with 7-inch casing below the 600-foot point, or drilling has ceased because impenetrable rock has been reached, the well shall then be deemed completed in all respects as provided in the contract of November 30, 1963.

"Save as herein modified, the contract of November 30, 1963 remains unchanged."

After executing the contract of 11 March, the contractor discontinued all work on the well and removed his drilling rig and tools from the land of the owner. The following month the contractor sent to the owner his log relating to his progress on the well, and on the log appeared the notation that he quit the well because the owner refused to pay for the drilling on an hourly basis.

In May of 1964 the contractor filed a mechanic's lien on the owner's real property at Congress, Arizona, and a short time later commenced this action to foreclose the lien. The owner filed her answer and counterclaimed.

## DOES THE EVIDENCE SUPPORT THE JUDGMENT?

 Rule 52A of the Rules of Civil Procedure, 16 A.R.S., provides that in actions tried without a jury the court shall, if requested before trial, find the facts and state its conclusions of law. In

accordance with this rule our Court has stated:

"The trial court's findings of fact will not be set aside unless shown to be clearly erroneous, because due regard shall be given the court's opportunity to judge the credibility of the witnesses. We will not substitute our opinion for that of the trial court when the evidence is in conflict." Carrasco v. Carrasco, 4 Ariz.App. 580, 582, 422 P.2d 411, 413 (1967). See also Brand v. Elledge, 101 Ariz. 352, 419 P.2d 531 (1966).

The *Carrasco* case, supra, in addition, cited with approval the following definition of "clearly erroneous" as follows:

" 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Carrasco v. Carrasco, supra, 4 Ariz.App. at page 582, 422 P.2d at page 413.

In viewing the findings of fact prepared by the trial court findings numbered 2 and 5 appear to be clearly erroneous when considering the entire evidence. Finding Number 2 states:

"Plaintiff-contractor's obligation was to drill a well hole sufficient to accomodate 8-inch casing, or 7-inch below 600 feet, to bedrock, *or to a sufficient supply of water,* or until the drilling reached the type of hard-rock strata in which, during an 8-hour test, less than two feet an hour could be gained." (Emphasis ours.)

Under finding Number 2 the trial court has given the appellee an additional ground for terminating the contract, to wit, if he finds a sufficient supply of water. This option is not found in the contract or the modification and we do not believe the evidence supports this view of the agreement. The methods under which either party could terminate the contract before completion are clearly set out in the 30 November contract in paragraph number 4. The contract does not empower the contractor with the right to terminate the contract should he encounter a sufficient supply of water, and the court's finding of fact in this regard is not supported by the evidence. Goodman v. Newzona Investment Company, 101 Ariz. 470, 421 P.2d 318 (1966). Even assuming that the contract contained this provision as indicated by the court, the evidence does not indicate that a "sufficient supply of water" was encountered at this level.

Finding Number 5 states:

"Plaintiff had a legal right to terminate the Contract, if he chose at 701 feet of depth because of the hard rock formation mentioned above and the Contract clause mentioned above."

According to finding Number 5 of the trial court, the appellee had a legal right to terminate the contract because he had fulfilled the conditions as set out in paragraph 4 of the contract. We have no quarrel with this statement if, in fact, the contractor had terminated the contract. The evidence does not indicate that he did in fact terminate the contract. His testimony indicates that he did drill in hard rock formation for about 100 feet, but no evidence of a test run or of his intention to terminate is indicated. We envision that the provision in the contract calling for "an eight-hour test" and giving either party the "right to terminate" calls for a test run as well as a definite notice to terminate. We find neither in

this case. Instead, after reaching a sand or gravel formation, the contractor obtained a modification to allow him to continue to 1,000 feet with 7-inch casing instead of 8-inch casing. The signing of the modification agreement does not indicate an intention to terminate, but on the contrary indicates an intention to proceed.

 In an action on a contract plaintiff has the burden of proof to show a contract, a breach, and damages. Thunderbird Metallurgical, Inc. v. Arizona Testing Laboratories, 5 Ariz.App. 48, 423 P.2d 124 (1967). In the instant case the plaintiff has shown a contract as modified, but no breach on the part of the defendant. Unless the contract is severable, the plaintiff may not recover on the contract for part performance. Shadron, Inc. v. Cole, 101 Ariz. 341, 419 P.2d 520 (1966). In the instant case the contract called for 1,000 feet. It was subject to termination under certain conditions not met by the plaintiff. The owner did not benefit from having the well dug to 701 feet, since she already had a well 650 feet deep some 50 feet from the site of the abandoned hole. We do not believe that this is sufficient part performance to support a judgment for the contractor. A reading of the evidence indicates the contractor did not perform the contract as modified, and the court's finding in this regard is clearly erroneous.

## THE COUNTERCLAIMS

The owner also appeals from the granting of judgment in favor of the contractor on part of the owner's counterclaims. The counterclaim was in 5 counts. Count 4 of the owner's counterclaim was abandoned at trial, and a reading of the evidence indicates that the findings of the trial court regarding Count 1 and Count 3 of the counterclaims is supported by the evidence. However, Counts 2 and 5 deserve some discussion.

 Count 2 of the counterclaim was to recover the $1,000 that the owner paid the contractor when at a depth of 580 feet he was unable to proceed with his drilling. Whether this "side agreement" was a part of the contract or a new one is immaterial. It was made outside the written agreement and fully performed on both sides. Therefore, the owner cannot contend that the agreement was executed without consideration, and the decision of the trial court will be sustained in this regard. Perry v. Farmer, 47 Ariz. 185, 54 P.2d 999 (1936).

In Count 5 of her counterclaim, the owner is seeking damages from the contractor for slander of title due to the filing of a mechanic's lien upon her property. § 33–991, subsec. A, A.R.S., provides that if the land is located in a rural area the lien shall extend to and include ten acres of land upon which the labor was performed. In spite of the provisions of this statute the contractor filed a lien upon all of the owner's lands consisting of approximately 82 acres.

 The contractor will be liable for wrongful assertion of title only if the owner can prove it was done maliciously. Salt River Valley Water Users' Association v. Peoria Ginning Company, 27 Ariz. 145, 231 P. 415 (1924). Not only must the owner prove the existence of malice, she must prove special damages in the form of loss of a present or a

prospective advantage. The trial court was in the position to weigh the evidence presented by the appellant in an attempt to prove malice and special damages. Having weighed the sufficiency of the evidence presented, the trial court was of the opinion that the owner failed to prove any special damages or present evidence indicating malice attributable to the filing of the mechanic's lien. We will not disturb those findings on appeal.

The matter is reversed and remanded to the court below with orders to enter judgment for the defendant-owner in conformity with this opinion.

DONOFRIO and STEVENS, JJ., concur.